IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 17 CR 417 |
| V. | ) | Judge John Z. Lee |
| | ) | |
| AUSTIN JONES | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S CLARIFICATIONS AND OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT; AND POSITION PAPER AND COMMENTARY ON SENTENCING FACTORS**

## <u>TABLE OF CONTENTS</u>

I.  Introduction ...................................................................................................5

II.  Guidelines Calculation ...............................................................................7

III. Clarifications and Objections to the Presentence Investigation Report ...............7

IV. Position Paper and Commentary on Sentencing Factors ..........................8

    A.  Introduction ...................................................................................... 8

    B.  Addressing Factors in Aggravation ..................................................9

    C.  History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1)) ..........10

        i.  Mr. Jones' Background ...............................................................10

        ii.  Sexual Abuse and Molestation by Mr. Jones' Father .................16

        iii.  Lasting Effects of Abuse on Mr. Jones' Adolescence and Young
          Adulthood ……………………………………………………………19

        iv.  Mr. Jones' Music Career and the Effects the Past Abuse Had
          on his Professional Career ....................................................... 25

        v.  Sexual Dysfunction  and Offense Behavior ............................... 34

        vi.  Remorse for His Past Conduct and Commitment to Exemplary
          Behavior in the Future ............................................................. 38

    D.  Mr. Jones' Commitment to Therapy, Compliance with Pretrial Supervision
        and the Need to Provide the Defendant with Medical Care or Other
        Corrective Treatment in the Most Effective Manner
        (18 U.S.C. § 3553(a)(2)(D)) ........................................................... 41

    E.  A Well-Below Guidelines Sentence Will be Sufficient
        To Comply with the Factors Set Forth in
        18 U.S.C. § 3553(a)(2)(A) ........................................................... 44

        i.  Nature and Circumstances of the Offense ................................. 45

ii.  Characteristics of the Defendant.................................................................. 45

iii.  The Seriousness of the Offense, Promoting Respect for the Law
and Providing Just Punishment …………………………………………46

iv.  Deterrence in Sentencing ………………………………………………  46

v.  The Need to Protect the Public From Further Crimes of the Defendant….48

**V.  Conclusion** .....................................................................………..……....  **48**

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Gall v. United States,* 552 U.S. 38 (2007) …………………………………..………. 5, 9

*Kimbrough v. United States,* 552 U.S. 85 (2007) ............................................................. 5

*Nelson v. United States,* 555 U.S. 350 (2009) ............................................................. 5, 8

*United States v. Booker,* 543 U.S. 220 (2005) ............................................................. 5, 8

*Rita v. United States, 551 U.S. 338 (2007) ......................................................................... 5*

*U.S. v. Baker, 445 F.3d 987 7th Cir. (2006) ...............................................................47*

*U.S. v. McGee, 479 F. Supp. 2nd 910 E.D. Wisc. (2007) ........................................................47*

**Statutes**

18 U.S.C. § 2252A ........................................................................................................ 5

18 U.S.C. § 3553A ………………………………………………………… .9, 38, 44, 48

**DEFENDANT'S CLARIFICATIONS AND OBJECTIONS TO THE
PRESENTENCE INVESTIGATION REPORT; AND POSITION PAPER AND
<u>COMMENTARY ON SENTENCING FACTORS</u>**

Defendant, **Austin Jones**, by and through his attorneys, **Terrence P. LeFevour and David E. Gaeger**, pursuant to Rule 32(c) of the Federal Rules of Criminal Procedure, the opinions of the United States Supreme Court in *United States v. Booker,* 543 U.S. 220 (2005), *Rita v. United States,* 551 U.S. 338 (2007), *Gall v. United States,* 552 U.S. 38 (2007), *Kimbrough v. United States,* 552 U.S. 85 (2007), and *Nelson v. United States,* 555 U.S. 350 (2009), as well as 18 U.S.C. § 3553(a), respectfully submits his clarifications and objections to the presentence investigation report (hereinafter "PSI"); and position paper and commentary on sentencing factors. For the reasons that follow, Mr. Jones, through counsel, requests that this Court impose a sentence of five years' incarceration, the minimum term of incarceration authorized by statute, which sentence is sufficient but not greater than necessary to effectuate the goals of 18 U.S.C. § 3553(a).

**I.      Introduction**

On June 13, 2017, Mr. Jones was charged in a two-count indictment charging the offense of Production of Child Pornography in violation of 18 U.S.C. § 2252A(a),  (Dkt. # 1). § 2252A(a)(1), which carries a mandatory minimum sentence of five years' incarceration, as well as a mandatory term of supervised release from five years to life. On February 1, 2019, Mr. Jones pled guilty to Count One by way of a written plea declaration. (Dkt. # 58).

In fashioning an appropriate sentence for Mr. Jones, this Court is faced with an incredibly difficult task. This is because the Court is asked to fashion a sentence that conforms with a guideline system that is not adequately equipped to consider cases so uniquely unfortunate as facts that are before your Honor in this matter. This truth is readily observable from the fact that Mr. Jones, a first-time, non-contact offender, is facing a guideline sentence that far exceeds the

statutorily authorized minimum sentence of imprisonment. Thus, any punishment fashioned by this Court will have a profound impact on the life of an individual who otherwise has had no contact with the criminal justice system.

That said, this is an undeniably serious offense. The harm that child pornography inflicts upon its victims, their loved ones, and society is so great, that its impact is typically beyond the comprehension of the offender while they are participating in the use of such materials and production. While that may have been the case for Mr. Jones at the time that the events of this case occurred, he now recognizes that his conduct, even as a non-contact offender, no doubt makes him responsible for any such harm. For that, he is truly sorry, has accepted responsibility, and is ready to make amends. Still, despite the deplorable nature of Mr. Jones' conduct in this case, it does not paint a full picture of his young life. Simply judging Mr. Jones by the worst of his conduct would result in an outcome that does not adequately account for his extremely unfortunate upbringing and many of the admirable contributions he has made to society. Fortunately, in our post-*Booker* world, Mr. Jones finds himself before a court that has the authority to fashion a just and appropriate sentence that considers the advisory guidelines as only one amongst many factors. Based on all of the other unique factors and circumstances discussed herein, counsels submit the only just and appropriate sentence is a sentence of five years' imprisonment.

## II.        Guidelines Calculation

The PSI submits, and counsel agrees, that Mr. Jones' total offense level is 38, which when combined with a criminal history category of I, results in an advisory guidelines range of 235 to 293 months' imprisonment. (*See* PSI, p. 8 ¶ 37).

## III.       Clarifications and Objections to the Presentence Investigation Report

Mr. Jones asks that this Court consider several minor corrections to the presentence report submitted by the United States Probation Office.  The first point of contention is with some of the descriptions of the abuse at the hands of his father. For example, on Page 16, Paragraph 103, the report indicates that his father "attempted to have the defendant touch his genitalia, but he refused." This statement does not accurately portray the abuse Mr. Jones suffered at the hands of his father. While Mr. Jones did refuse to touch his father the first time he attempted such conduct, Mr. Jones eventually gave into his requests and was forced to touch his father.  Furthermore, on Page 16, Paragraph 106 the report reads that Mr. Jones developed anxiety and the "fear to fall asleep."  In reality, at that time in his life (age 12-13), Mr. Jones was actually suffering from flashbacks and panic attacks associated with the PTSD that was associated with his father's nighttime routine.

Mr. Jones also wishes to clarify several claims made about his psychiatric treatment and his current mental state.  First, Mr. Jones would like to make it clear that, contrary to Page 17, Paragraph 111, he had only been receiving sporadic psychiatric treatment until May of 2017.  He unfortunately was not meeting with Dr. Eisenberg on a weekly basis at that time.  Next, Mr. Jones refutes ever making the claim in Page 16, Paragraph 106.  Specifically, he has no recollection of stating that he was "addicted to taking advantage of being famous." Finally, Mr. Jones flatly rejects any notion that he is currently suicidal, or at a risk of harming himself.  Specifically, the probation department relies on Page 17, Paragraph 110 to justify their position that Mr. Jones should be

immediately taken into custody due to his being a risk of suicide. That is a misrepresentation of the replies to the questions asked of Mr. Jones. His response of "I was thinking of ways to kill myself upon his release from custody" was in response to a question regarding his mental state over two years ago. All other tendered medical information provided to this Court documents a strong progression by Mr. Jones while in therapy. Furthermore, Mr. Jones will benefit from the same family support and medical treatment that he has had over the last several months at his new residence, should he be allowed to self-surrender. In other words, Mr. Jones is no longer the same person that gave the above statement. Thus, he asks the Court to consider these corrections and clarifications during its evaluation of these materials.

### IV. Position Paper & Commentary on Sentencing Factors

#### A. Introduction

This Court is certainly well aware of the nature and circumstances of the offense given the allegations to which Mr. Jones has plead guilty to in the Government's version of the events. As was stated above, that conduct is no doubt a serious offense. However, those facts are only a portion of what must be considered before this Court issues a just and appropriate sentence. The ability to consider many other factors under *Booker* is critical in a case such as this. Specifically, because the traumatic life experiences suffered by Mr. Jones prior to committing crimes give such insight as to why he acted in the manner in which he did, it is critical that the Court be allowed to exercise its discretion under *Booker* to take that information into account.

As this Court is no doubt well aware, per *Booker*, the applicable guidelines range has been advice this Court should consider but is not required to follow. *Booker*, 543 U.S. at 264. But even as advice, the guidelines may be flawed and are not to be presumed reasonable. *Nelson v. United*

*States*, 555 U.S. 350, 351 (2009) ("[t]he Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable").

Nevertheless, the guidelines remain a "starting point" and "initial benchmark" for this Court to consider in the determination of a just and appropriate sentence. *See Gall v. United States*, 552 U.S. 38, 49-51 (2007). As this Court knows, per *Gall*, before determining a sentence that is ultimately "sufficient but not greater than necessary to achieve the purposes of sentencing," it must consider all of the § 3553(a) factors. As mentioned, and as will be discussed at much greater length, counsels submit that the advisory guidelines range of 210 to 240 months' incarceration is excessive. In the alternative counsel respectfully submits that, after considering the guidelines as a "starting point" and "initial benchmark," the just and appropriate sentence in this case is a well-below guidelines sentence.

### B. Addressing Factors in Aggravation

One of the most significant aggravating factors the government will no doubt emphasize is what it considers to be Mr. Jones' relevant conduct; namely, that Mr. Jones had previously requested videos from other individuals dating back to 2015. This includes several of the 2016 incidents that included contacts that were extremely similar to the ones that were charged in this matter.

Prior to being charged in this case Mr. Jones had never been given the aid of regular psychiatric rehabilitation outside of sporadic meetings until the time of his arrest. Furthermore, no other medical professionals were able to evaluate Mr. Jones until after his arrest in this case. Therefore, he was unable to treat and process the underlying issues that gave rise to this conduct—Mr. Jones did not understand the depth of his illness or the consequences his actions would have

on the victims of his crime, both seen and unseen. Finally, throughout the course of his pretrial supervision, Mr. Jones has obeyed all court orders and instructions from pretrial officers without incident and continued to show his ability to lead a wholesome existence. This is critically important when determining whether or not Mr. Jones possesses positive qualities that are contrary to the picture that will be painted by the Government in its analysis of "other relevant conduct."

### C. History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))

### i. Mr. Jones' Background

As this Court has been made aware through the course of this case, Mr. Jones' upbringing is one that is filled with complexities. For most, it appeared that Austin lived a happy life full of love and support. However, the reality was a life marred with abuse, pain, loss and death. At times, it was relatively comfortable and he did not go wanting. At other times, it was punctuated by all manners of abuse—physical, emotional, mental, and sexual—at the hands of his most trusted caretakers—his grandparents and father. As your Honor will read below, the long-lasting effects of this abuse would be compounded by the death of his sister at a young age, and the loss of his family's home in a fire. The following information gives a detailed summary of both Austin's life, and the context for the crimes which he has plead guilty. This information is the product of interviews and discussions conducted by both counsel for Mr. Jones and by mitigation specialists contracted by counsel to assist in painting a full picture of Mr. Jones' life.

Austin, age 26, is one of four children born to the union of Robyn Scurek and Henry Jones. His brother, Zachary, age 24, resides in New York City and is currently employed as an actor in the Broadway production of Mamma Mia. His brother, Sean, age 22, is currently employed as an

actor in the ensemble of the first national tour of *Hamilton: An American Musical*. Felicia, the oldest of the four children, passed away at age 10 from acute pancreatitis.

The union between Mr. Jones and his mother was a contentious one from its beginning. Austin's father Henry (now deceased) and his mother Robyn met at a young age. In fact, Robyn was only 19 at the time that she began her relationship with Henry. Henry worked a union job as an elevator and escalator technician, and played music part time. As their relationship progressed, Robyn began to notice a heavy increase in Henry's use of alcohol. However, having not being exposed to alcoholism before, Robyn ignored the warning signs thinking it was "a social thing and wouldn't be a problem."

Three years into their relationship, Robyn and Henry wed in 1984. Shortly thereafter they purchased a home in Prospect Heights and began a family. However, after the birth of their first child Felicia, Robyn noticed that Henry's drinking began to dramatically increase. Friends began to comment on how often Henry was getting "completely trashed." His abuse got so bad that at one point he was suspended from his job after it was discovered that he was intoxicated at work.

Based on his continued downward spiral and his suspension from work, Henry entered into a substance abuse program. In the beginning it appeared that the program had set Henry down the right path. Henry managed to stay clean for several years, and the couple had two more children; Austin and Zachary. However, during Robyn's pregnancy with their fourth child Sean, Henry began to severely relapse into more serious substance abuse. According to Robyn, Henry "completely fell off" and his behavior became destructive to both himself and his family. Robyn discovered that Henry had began to abuse cocaine along with his alcohol use. Robyn began to notice money missing from the family's account, and Henry began abusing his family. She was given no choice but to separate herself from Henry. Robyn stated:

> For me this was the final straw. I gave him so many chances and now he was doing cocaine. I just couldn't do it anymore, and when he amped it up to cocaine I was not prepared for that. He started to get really paranoid and went way off the range. I told him he had to get out, and he went to live with his parents. He started stalking us, showing up at the house randomly. It was really creepy. He did nothing to get his life on track.

Two months into the separation Robyn filed for divorce. Chaos and dysfunction ensued during a two-year bitter divorce during which Henry resided with his parents. Henry's parents immediately turned against Robyn and tried vehemently to convince Austin and his siblings that she was a "horrible person." Austin witnessed the police forcefully remove his father from their house and was subjected to an extremely hostile environment at his paternal grandparents' home. Austin described it as follows:

> My grandfather's favorite thing to call me was "fucking faggot." I had long hair and he would literally grab me by my hair and say different gay slurs. This happened every time we were there. I was super scared of him. I literally thought he was going to hit me. My grandma didn't insult us, but she took every opportunity to criticize my mom, calling her a freeloader, whore and bitch, which was really weird when you are 9 years old to hear someone talk about your mom that way.

As part of the divorce agreement, Henry was granted joint custody which included visits every other weekend at his parent's home. The court order further stated that Henry was prohibited from using alcohol or drugs 24 hours prior to or during visitation with the children. Henry was not motivated to see his children, and the weekends were often shortened to just one night. Austin continued to visit his father until he was 10 years old.

While their divorce was pending Robyn began to lean on her friend Howard Curtis for support. Howard and Henry played together in the same band, and he had been a close friend of theirs since before she and Henry were married. Howard, who was divorced, was very supportive of Robyn and had known her children since birth. Their friendship grew into a romantic

relationship which remains today. Howard has a son from his marriage, Ryan Curtis, age 34. Even as of this date, Howard has been the only positive male influence in Austin's life. However, Howard's presence would not do enough to overcome the tremendous trauma suffered by Austin and his siblings at the hands of his father.

The pain inflicted upon Mr. Jones and his siblings was an overwhelming burden on both Austin and his family. Robyn was working several jobs in an attempt to provide for her family. Henry provided minimal financial support to his family, so Robyn was forced to work long hours away from her children in order to provide for them. During this time, the negative impacts of the family relationship began to take a toll on Mr. Jones' sister Felicia. Felica was six years old when Robyn and Henry separated and according to Robyn she was, "a skinny little thing." Over the course of the next four years Robyn indicated that Felicia gained an extreme amount of weight, and by age 10 she weighed 170 pounds. Her weight gain was a significant issue, and Robyn tried desperately to understand what was going on with her. She sought medical help and participated in various programs with Felicia in an attempt to control her weight; however, was unsuccessful.

Robyn recalled when Felicia was 10 years old she asked if she could stop spending the weekend with her father. Felicia told Robyn that her grandmother yelled at her all the time, and that her dad didn't spend time with them. Robyn inquired whether her father had ever hit or touched her. Robyn recalled Felicia's response, "If he had, I don't remember. He's never hit me that I remember, and I don't think that he's ever touched me that I remember." Robyn thought both of those responses were odd, and she intended to follow up with Felicia the following day. That night Felicia was hospitalized after complaining of severe stomach pain. She was ultimately diagnosed with acute pancreatitis, an extremely rare illness in children. After several days Felicia's condition declined and her organs began to shut down. In Robyn's own words:

Due to liver failure she started to turn yellow and she developed a high fever. I would not let Austin and his brothers see their sister like this. I didn't want that to be a memory for them. I desperately hung onto hope, but on February 20th, 1999 at 4:30 a.m. I held my daughter's hand as she left this earth. For the first time in 12 days I was headed home, without my first born. Words can't even explain the emptiness. I was beyond devastated.

When they arrived home from the hospital, they faced the daunting task of informing the boys that their sister had passed away. During an interview with Howard he recalled this somber moment:

This was such a sad time. I remember looking at the boys who were asleep on the floor of the waiting room and thinking, particularly about Austin who was old enough to understand what was going on, this poor little dude doesn't know that his sister just died. When we got home, there was so much crying. Robyn's grandmother arrived at the house and she was hysterical, and as you can imagine with the sudden death of a child everyone was distraught. Whether or not Austin was capable of feeling that level of grief or not I don't know, but he was certainly exposed to a kind of grief that was so thick, and it lasted for a long time.

During an interview Austin recalled this incredibly sad time in his life:

I just remember every adult in my life crying. Adults couldn't even look at me or my brothers without crying. It was a lot to see everybody older than you crying so much. Once she was gone the atmosphere in the house was completely different. It wasn't happy anymore, nobody was really talking to me or looking at me, and when they were, they were crying.

The family was engulfed in sadness. For days Austin listened to the guttural crying and watched the adults that he loved so much fall apart. Robyn in many ways was emotionally paralyzed and understandably struggled for months. Austin remembers his mother being very depressed and sleeping a lot after Felicia passed away. Austin shared a very close relationship with his sister and according to Robyn he was "lost" without her. Losing Felicia was the first of several traumatic events that would devastate Austin.

Austin shared a very close and loving relationship with his brothers and his mom during early childhood. He stated, "My mom would do anything for us. Even though she lost a child,

14

she loved her other three children and wanted to do the best she could for us. She worked so many jobs just to make sure we had what we needed."

In the months following Felicia's death, Austin turned to the performing arts as an outlet for his pain; as well as a method to keep the memory of his sister alive. He began dancing and showed signs of a return to a normal childhood. However, at around age 10, Austin's life suffered another emotional trauma when his relationship with his father was ended. After arriving to drop the boys for a weekend visit Robyn realized that Henry was intoxicated at which point, she ordered the boys to get back in the car. Austin vividly recalls a shouting match between his dad, grandparents and his mother:

> It was mostly my grandparents calling my mom a "whore, slut and cunt" and saying that she was ruining our lives. I remember my brothers and I were in the car and my mom was standing in the driveway. She was standing there taking all this shouting, and she was holding our video games. My grandma kept slapping them out of her hand, and they would fall to the ground and break. It was really nasty. I don't think I have seen an anger match like that in my life. That was the last time I saw my dad.

The amount of loss Austin suffered during his early childhood is of significant impact. Four months after Felicia passed away Austin's aunt passed away from ovarian cancer. Six months later Austin's maternal grandmother, whom he was very close to, was diagnosed with cancer and within a year she passed away. Four months later his maternal great-grandfather passed away. As Zach stated in his character reference letter, "Growing up Austin, Sean, and I attended more funerals than birthday parties. I became desensitized to the reality we were living, but Austin never did. He loved our family and with every death he buried a bit of himself with them."

### ii. Sexual Abuse and Molestation by Mr. Jones' Father

In the months following his arrest, Mr. Jones made revelations regarding the sexual abuse of both himself and his siblings at the hands of his father. The disturbing details show how his innocence was destroyed at such a young age, leaving a boy with extreme nightmares and a life with no peace. However, these details also put into context how an individual like Mr. Jones could conduct himself in the manner in which he did in this case.

Subsequent to the divorce Henry resided with his parents in a two-bedroom ranch home in Mt. Prospect, Illinois. As a result of his addiction and lack of employment, he was unable to support himself. Austin recalled that when Felicia was still alive, she slept alone in their father's bedroom, and he and his brothers would sleep in their grandparent's bedroom with their father. The grandparents would sleep in the living room. Austin does not recall any inappropriate behavior prior to his sister passing away. Austin's first recollection of something inappropriate was at age 6 when his father got into the bathtub with all three boys. He remembers:

> It felt like an incorrect way to take a bath. I remember him touching my genitals for much longer than normal. While he was doing that, he was also touching his genitals. He would do the same thing to my brothers, and it happened multiple times. I remember feeling that it was kind of weird, but I didn't really know what any of that was.

Approximately one year later when Austin was 7 years old the sexual abuse by his father escalated. By this time Felicia had passed away, and Austin was instructed to sleep in his father's bedroom. Austin recalled:

> I would go to bed on my own, and then my dad would come in the room later. He would either sit or stand next to the bed and start touching me and touching himself. I remember being very confused and asking him what was going on, and he told me this is how people say I love you and show love. At first in some strange way it felt like a form of attention, and I thought maybe this is only something your dad does with you because I knew my mom never touched me like that. This happened

16

every time we slept over there and it only got worse. He started to ejaculate onto my body or my face and fondling my rear end. It got to the point where he would stick his fingers in my rear end while he was touching himself. After he was done, he would always leave and go sleep in the room with my brothers.

Austin remembers vividly when it changed from feeling like special attention to inappropriate and scary:

Up until this point he would typically stroke himself next to the bed and touch me in different areas and mumble about how this is how people show love. Then one night he took my hand and placed it on his penis and I pulled my hand away. He broke down and started crying and started saying things like, "Your mom won't even love me anymore and now you won't love me." He made me feel like I had to do it to show him I loved him. He just kept using my mom's name and saying, "Your mom left me and she won't even do this for me anymore." Right then I thought this isn't right, but I was scared. I remember actually saying, "I'm sorry" because I saw my dad crying. I just wanted my dad to love me, and I remember feeling the only way that my dad will love me is if I do this for him. He grabbed my hand and said, "I'll show you how to do it." He did it until he ejaculated and that started a routine that would last several years.

Austin was a victim of sexual and emotional abuse by his father from age 6 until age 10. He was young, helpless and scared. Subsequent to this abuse Austin, who had been previously potty trained, began wetting the bed nightly and did so until age 11.

Sadly, Henry's sexual abuse was not limited to Austin. Mr. Jones' brother Zach has also given a detailed account of the sexual abuse that he suffered at the hands of his father. Specifically, Zach recalled his father being in the tub with he and his brothers, and his father touching himself and ejaculating in the tub. He remembered his father would often leave the bedroom for periods of the night, and then return and sleep in the bed with him. Zach reported that he was also sexually abused by his father, forced to put his hands in his pants and touch his genitals, and his father doing the same to him. Zach acknowledged that he has maintained a secret dysfunctional sexual life since his early teenage years, and that an attraction to older men led him to begin engaging in

inappropriate relations with men starting at age 13. Zach has been overly sexually active since childhood and related he has used his body and intimacy as a way to seek and sustain relationships. Like Austin, Zach did not disclose the sexual abuse he suffered as a child, nor his inappropriate sexual activity, until recently.

Thankfully, Mr. Jones' younger brother Sean was not subjected to the same abuse that his two older brothers were. However, Sean has stated that he feels that he was only spared such abuse based on the actions of his two older brothers. In his character reference letter Sean described how he was protected:

> Every time we went over to my grandparent's house Austin and Zach continued to protect me from worse abuse than we were already getting, and my father's true identity. Imagine that. It's like taking a bullet for your siblings every other weekend for years on end. Austin suited up in armor every time we went over there. I'm forever grateful and sorry for Austin's sacrifice. It's because of his actions as a young child that kept me safe.

From the perspective of his siblings, it was clear that the abuse that Mr. Jones suffered during this time in his life was crippling to his development as a healthy child. In the profoundly emotional and stirring letter by Austin's brother Zach, he describes his perspective of the abuse Austin suffered:

> Our father conditioned Austin to earn his love through unspeakable means. Imagine offering your physical body against your will to a man who is supposed to love and protect you while the rest of your being is forced to sit back and watch. Imagine that night after night. The more your faith is horrifically tested, the less you trust yourself. Every day your heart and soul crush a little more until there is no longer an ounce of who you are or vision of who you could be. Because of this man not only was Austin's sexuality devastatingly stunted, confused, and damaged, but rediscovering his sense of safety, existence, and self was another mountain to climb.

### iii. Lasting Effects of Abuse on Mr. Jones' Adolescence and Young Adulthood

Austin's father robbed him of his childhood and caused emotional trauma and chaos that has consumed his life. Not surprisingly, severe depression, low self-esteem, sexual dysfunction, and difficulty sleeping have plagued Austin's life since age 11. Austin related:

> Things became very tough for me around age 11. I was depressed. I started failing classes, and from then on school was a major struggle. Each year I would do just enough to pass,, but it was a constant battle. I had very few friends in middle school and that's when I started getting bullied. I got called gay because I was on a dance team and I had long hair.

> Around this time, I started to reflect and analyze my experiences with my dad, trying to figure out what they were. I started to believe that all those things that happened were my fault, and there was something wrong with me. In my head I thought I was the only person that had ever experienced that. I was so critical of myself and would constantly beat myself up over little things. It was never just a "mistake," it was, you made a mistake because you are a terrible person.

Entering high school Austin was socially withdrawn and immensely insecure. The enrollment at his high school was approximately 2,800 students. Austin vividly recalled his first day of high school:

> I remember coming home the first day of school and just crying in my room. I didn't know exactly why, but I just felt so uncomfortable and out in the open with so many students. It literally made me anxious walking through the halls, and all I could think about was, "What do they think of me? Am I going to say something that's going to make them hate me?"

Austin avoided going to school as often as possible, refusing to get out of bed and repeatedly feigning illness. According to the school policy a student was allowed up to 15 absences per semester before penalties were imposed. According to Austin:

> I missed 15 days of school every single semester and it became a major issue with my mom and Howard. They were extremely frustrated and thought I was just lazy and didn't want to put in the work. The fact of the matter was by this time it was a mental list of pros/cons of deciding to kill myself. The nights I was experiencing

> started to become so terrifying for me and so painful. I couldn't sleep and it was messing up my days. I didn't like myself, and eventually it turned into what is the point of getting out of bed. I'm not having any fun in my days, I hate who I am. I would rather be someone else. These thoughts played all throughout high school, and that's what had such a huge impact on me and what made me so depressed.

Although Austin shared a close relationship with his brothers growing up, early on in high school he began feeling inferior to them. They were surpassing him in dance, excelling in school, and did not appear to be struggling socially or emotionally. Austin related:

> Compared to them I felt talentless, awkward, and so ugly. I envied them so much and so desperately wanted to be someone other than myself. When I was about 12 years old, I remember looking at my brothers, who have brown hair and brown eyes like my mom, and looking at myself, blonde hair and blue eyes like my dad, and thinking, "My brothers take after my mom. They got the good genes. I look like my dad, my middle name is Henry. I'm going to be a failure like my dad because I got his traits. When I pieced that together in my head, it made me hate myself even more.

Already engulfed in utter self-hate, struggling during the day and suffering tremendously each night, during Austin's sophomore year he experienced another tragic event which pushed him into a downward spiral. On December 29, 2008, while visiting relatives in Wisconsin, Robyn received a phone call from a neighbor that their house was on fire. When they arrived home four hours later, the house was severely damaged, the entire first floor completely destroyed, and everything on the second floor damaged by the smoke. The family lost all of their photos, and most devastating was the loss of Felicia's personal items and pictures. The computers which stored additional photos and video memories were stolen. It was determined later that the cause of the fire was arson, possibly to cover up the burglary and point of entry. According to Robyn, numerous liquor bottles, the same brand that her ex-husband Henry drank, were discovered in the house during the arson investigation. In a character reference letter submitted by Austin's aunt, Julie

Cisek Jones, she stated, "Although never proven, it's an open family secret that Austin's father likely burned that house down."

The family was displaced from their home for a year and a half, and for Austin the fire was a catalyst to an even further emotional decline. As he recalls:

> We lost everything, every baby picture, all our childhood memories, every memory of Felicia, was gone. We couldn't get into the house right away because it was a hazard with the cold weather, so four months later we had to go through the entire house to try and get an inventory for the insurance. It was such an exhausting and emotional process. The overwhelming sense of loss pushed me into being even more depressed. After the fire I just didn't want to do anything, and that's when I started to cut myself.

> With the cutting I was looking for a way to take all the emotional pain and hate I had and somehow express and feel it physically. It was a rush, and afterwards I felt somewhat peaceful and relaxed.

Six months after the house fire Robyn received a phone call from Henry's brother informing her that Henry was in a coma and dying from alcoholism. Austin was 16 years old at this time. Robyn gave her sons a choice if they wanted to see their father before he passed away. Sean was the only one who accepted and Zach agreed to go with him. Austin adamantly refused. According to Austin:

> I was scared to see my dad at this point. I remember sitting in the waiting room while my brothers went into the room, and there was a relative in there and all he kept saying was how I was a spitting image of my father. I just wanted him to stop. I hated being there. Just knowing I was in the same building as my dad was such a rush of emotions.

Two months after his father passed away Austin's maternal grandfather, who had just recently told them he had been diagnosed with cancer, passed away. According to Robyn that really "wrecked" Austin as they were extremely close.

21

Witnessing Mr. Jones' rapid decline after the fire and realizing the amount of loss he had suffered Robyn sought outside help and Austin began counseling with David Torres. This counseling continued on and off until 2015. At this point in time, Robyn felt that only a professional could adequately help Mr. Jones with his mental and emotional difficulties. That treatment, however, was only made available to Mr. Jones on an "on-and-off" basis until 2015.

The remaining two years of high school were daunting for Austin as he was in a state of utter desrepair. Overwhelmed socially, emotionally and academically, it was often a struggle just to get out of bed. (See the attached math quiz dated February 18, 2009 and the email dated October 1, 2009, both clear examples of the extent of Austin's struggles and the desperate cries for help.)

During an interview with Zach he recalled how troubled Austin was from an early age:

> I just remember Austin always having problems. He would have emotional outbursts, run away, he hated school, and he never slept. He had a bed wetting problem and terrible nightmares when he was young. He got bullied a lot, and he had terrible self-esteem. I think he looked at himself as not as talented and not as worthy. I remember after the fire it got really bad, and he started cutting himself with the back of his belt. He would say that it was his only way to feel anything. At that point he was an absolute shell. He definitely was not normal. Once we moved back into the house and he got his own bedroom he really started to isolate himself, and he got sucked into the computer. I think after the fire we all branched out in our separate ways, and we stopped connecting as a family. Austin had been bubbling for a while, but now he was really alone.

During an interview with Sean he also recalled how Austin struggled tremendously during childhood:

> Austin has always struggled with self-esteem. I feel like he always thought he wasn't adequate enough, whether it was dancing, singing, or acting. He would often quit and just submerge himself into his headphones and sit in the corner. I just always thought he was massively depressed. Any time he had the chance to disconnect, he took it. I remember he also had trouble sleeping, and when he got his own bedroom, he was always awake.

Mr. Jones' struggles with both social and personal development lasted him the duration of his high-school years.  He continued to struggle in school, and his participation in theatre and dance productions began to wane.  At this point in his life, Mr. Jones found refuge from his depression and anxiety only in music.  By his Senior year in high school, it was clear to Austin that a career in music was going to be his path in life. He began creating his own music, and by the end of that year he had released his first album.  At that time he also made the decision to attend Columbia College in Chicago to study music production.  At that time it appeared that Mr. Jones' life was finally getting on track. However, Austin had a setback his second year at Columbia, and due to severe anxiety and depression withdrew from classes for one semester.  At this time Austin was prescribed two different psychotropic medications, both of which resulted in Austin's symptoms increasing.   After one semester off Austin was able to return to Columbia, and he continued to work on his music production.   After 3 ½ years Austin withdrew from Columbia to pursue his music career full time.  He has remained living with his mother and Howard in Bloomingdale. (Austin's music career will be discussed in detail later in this report.)

Austin's only romantic relationship was with Tanya Ashton which began right after high school and lasted for approximately four years.  When the relationship began, Austin was 18 years old and Tanya was 24.  They had known each other for many years as Tanya and her mother were employed at the dance studio where Austin had been performing since childhood.  Tanya was a dance instructor and her mother a costume designer.  When their friendship turned into a romantic relationship, Tanya demanded that they keep it a secret from everyone except Austin's family. Austin agreed in the beginning, but after several years he struggled with sneaking around:

> She would tell me things like once you make it big in the music business, we can tell my family.  I would tell her that it makes me feel really bad about myself, like I'm not good enough to be her boyfriend.  On top of the secrecy she would never compliment me and she didn't seem to care about things I would do for her, even

> when I wrote songs for her. It was definitely more giving on my part. After more than 3 years of her refusing to even call me her boyfriend I tried several times to walk away, but she would threaten to kill herself. I felt completely trapped because I truly loved her.

The relationship with Tanya eroded Austin's already severely damaged self-esteem. She was insensitive to his mental health issues and was clearly not someone he could confide in about his depression and lack of self-worth. In regards to the type of music Austin was writing, he recalled her saying, "I can't stand this kind of wrist-cutting music." This complete lack of support left Austin feeling vulnerable and shameful about his own self-harming and depression issues.

As seen through the eyes of his brother Zach:

> Tanya broke Austin. She treated him like shit and sucked everything she could out of him. That relationship was so destructive for Austin's self-confidence. Keeping everything a secret was just another way to punish him. She saw him having this brilliant music career, and she saw a way to the future she wanted, which was all about money. No matter how many songs he wrote for her or how thoughtful he was, he was never good enough for her. I think he stayed in it for so long because she was the first person that sort of gave him a chance. She gave him the hope that he could be normal.

During an interview Robyn revealed the following about Austin's relationship with Tanya:

> I heard her several times tell him that when he was famous enough, she would tell her parents about their relationship. He was never good enough for her, and when he needed her most, she was unavailable. It was a very sad relationship, and it was sad to watch Austin being treated that way. When he finally did try and end the relationship, she even sent me a text message saying that she would kill herself if he broke up with her.

In early 2016, after several months of not responding to Austin's text messages, Tanya ended the relationship in a text message that stated, "Stop texting me. I'm seeing someone." This four-year toxic and destructive relationship is another oppressively sad time period in Austin's life.

### iv.  Mr. Jones' Music Career and the Effects the Past Abuse Had on his Professional Career

Considering the absence of any professional music instruction, what Austin accomplished in the music industry is nothing short of spectacular.   In the extremely competitive music industry where there was an abundance of aspiring musicians on YouTube, Austin stood out.     His tenacious work ethic and absolute tunnel vision resulted in an enormous following both nationally and internationally.   Austin has a gift for music, and during the latter part of high school he devoted himself to this new-found passion.  He worked tirelessly familiarizing himself with music software programs which led to the production of his first album, Out of Character, in 2010.  His next album, From Under the Covers, was released during his first year at Columbia College in 2011.  Shortly after this album was released Austin played his first concert at a local venue which attracted approximately 100 people.  His next album, which was a re-recording of previous songs, Out of Character 2.0, was released in 2012.  Austin recorded the majority of his music in his living room and released it through various social media outlets.  Austin was remarkably savvy with how and where he promoted himself online, and he quickly accumulated a following.  During an interview with Austin's tour manager, Howard's son and lifelong musician, Ryan Curtis, he explained Austin's exceptional talent:

> What Austin was producing using Garage Band software was brilliant.  It is very hard to produce material like he was with just that program.  It's not the tool for the job, but he was pulling it off.  Beyond his song writing capabilities he was a master in production, and he had an ear for arranging his music.   These are different skill sets, but he had all the gifts.   For somebody who had never taken any lessons, what he was doing was really impressive.  And his talents didn't stop at his music.  He got himself so close to having a major record deal without hiring a marketing company, without a major label, and without anyone pulling strings for him.   He mastered the marketing and release cycle, and as soon as he put it all together, his music hit the billboard charts.   I know hundreds of musicians, and I don't know anybody that could have done that by sheer force of will like he did. I was getting

ready to prepare the rest of my life to help Austin and manage his tours. I was literally going to quit my full-time job. I believed he was a true artist with so much potential, and he was on his way to being a permanent player on the scene.

Austin remained extremely self-conscious and vulnerable during the beginning of his career, and recalled after his first concert beating himself up and feeling that he was not good enough to pursue music as a career. As his fan base increased, he experienced a sense of hope, something he had lacked his entire life. As he recalled:

> In the beginning my fans were people that knew me from high school. The first time someone from Michigan messaged me that she liked my music it felt way too good to be true. Like it wasn't my real life. It felt so good to have someone interested in my music and me as a person. They wanted to get to know me and communicate with me, and I wasn't really getting that in regular life. As more people started reaching out, it started to fill me with an excitement about life that I was lacking, something that I didn't even know I wanted.

Throughout 2012 and 2013 Austin continued to perform local shows and gained recognition from small bands. At the end of 2013 Austin released his third album, We'll Fall Together, which he described as his first "emotional" album. He stated:

> I finally wrote for myself honestly and I was much more open about my experiences with depression, self-harming and suicide. I was doing it to show people that they weren't alone.

Austin's emotional third album had a tremendous impact on his career and catapulted him to legitimate national recognition within the music industry. On the iTunes chart the album charted in the top 100 "Pop" genre based off sales in the first day. This alone was a huge accomplishment for Austin. Austin's online fan base increased significantly over the next year, and by 2014 he had approximately 100,000 fans on Facebook alone.

In the Spring of 2014 Austin released a 4 song EP titled, We'll Fall Together B Sides. This album charted on the Music Billboard "heat seeker" chart where first time artists hit the Billboard

chart. This was a phenomenal accomplishment for Austin and the beginning of his official career in the music industry. A few months later Austin hired a manager and withdrew from college to focus on his music career.

Austin's first concert tour took place in January 2015, and he was scheduled to perform that summer on the Warped Tour, one of the largest touring music festivals in the United States. In May 2015, during his second tour there was a negative media blast posted on Twitter that stated, "Austin Jones asks under-aged girls for dancing and twerking videos." This post went viral and within a week the negative publicity caused Austin to cancel the remainder of the tour. He was subsequently dropped from the Warped Tour as a result of the negative publicity. Austin stated, "Tens of thousands of people were slamming me on social media, telling me to kill myself, and that I was an awful person. I was so scared. I hated myself and hated what I was doing." Devastated and suicidal Austin's mother transported him directly to the hospital when he returned home.

Vulnerable and emotionally fragile, Austin was unsure how to move forward with his career. At this time, he was connected to Kevin Lieman, the creator and producer of the Warped Tour and a music industry person that Austin had looked up to for many years. Mr. Leiman began advising Austin directly and he encouraged Austin to publicly apologize to his fans through a heartfelt video message and then move on with his career. Austin followed his advice and posted a video apology in June 2015. Austin subsequently fired his original manager and began to rely on the guidance of Mr. Leiman and others without a signed contract.

Just a few months after the video apology Austin had a falling out by one of Mr. Leiman's associates which resulted in Mr. Leiman cutting all ties with Austin. Feeling lost and hurt by their

actions Austin turned to his original manager who agreed to resign him. It was at this time that Ryan became Austin's tour manager.

Austin's music career not only survived the negative publicity and management issues, it flourished. From 2015 until his arrest in 2017 Austin completed five U.S. tours and one European tour. Crowd sizes averaged approximately 300 in the U.S. and over 1,000 in Europe. In 2016 he released his last album, a cover album called Pitch Imperfect. By 2017 he had over 1 million Facebook fans, approximately 500,000 followers on YouTube and 300,000 followers on Instagram and Twitter. According to Austin he could post a picture of himself on Instagram and within 2 minutes over 500 people would "like" his photo. In 2014, Austin posted a meet up, which stated he would be at Millennium Park at a certain time if anyone wanted to meet him. Austin recalled that the park police had to escort him and the overwhelming number of fans to an open park area that could manage the crowd. After approximately eight hours Austin greeted each and every fan.

The amount of attention from fans eventually overwhelmed Austin and became a major source of stress. By 2015, Austin was averaging approximately 1,000 messages per day in his Facebook page inbox. The enormous amount of pressure on a young man so severely wounded himself is staggering. In his own words:

> I couldn't keep up with all the messages I got, and it became a huge source of anxiety. The messages were so often emotional cries for help, saying they had no one else to talk to, or would cut themselves if I didn't respond. The pressure was awful, and there was no way I could ever respond to all of them, which made me feel terrible. I always felt like I wasn't doing enough. It was so overwhelming that often I couldn't focus on what I was supposed to be doing. I felt like there's this phone in my pocket that was heating up, and people are close to harming themselves and I need to do something about it. There was only so much advice I could give when my own life was falling apart. I did the best I could to be there for people emotionally. I wanted to give people hope, and I made it appear that I

had a grip on my depression, but on the inside I was still struggling. People had expectations from me that I could never achieve, but it didn't keep me from trying.

Austin recalled that early in his career, in approximately 2013, one of his fans committed suicide. Although he didn't know her well this troubled him deeply:

> We had been messaging back and forth a few times, and she told me that she was struggling with depression. She told me that my music was very uplifting and helped her when things were tough. To find out a few months later that she killed herself was extremely sad. I always thought about what more could I have done. I thought about that scenario all the time. I was like who knows if this person is so close, and my message could be what turns it around. That's a lot of pressure to be under.

Austin's tour manager, Ryan, witnessed many conversations Austin had with fans after shows and quickly realized how emotionally draining this became for him. He stated:

> After every show he would sign autographs and take pictures with his fans. I would often hear fans thanking him for saving their lives, taking the time to talk them off the ledge when they were suicidal. There was a connection with Austin and his fans, and it was important to him that he meet and listen to each and every one of his fans, even though it was obvious how difficult this was on him. At the end of every meet and greet he was emotionally exhausted. Dozens of cities, thousands of fans, and every night he would give what he had to them until there was very little of himself left.

During the pendency of this case, counsel has reviewed approximately fifty fan letters which were previously submitted to Austin. These letters contain agonizing stories of abuse, depression, self-harm, and suicidal thoughts. The depth of the personal tragedies detailed in the letters were astounding and by any standards emotionally overwhelming. Following the tragic stories were heartfelt words of appreciation to Austin for his music and his help in saving their lives, and then a request for him to respond. Following are just a few examples: "You have saved my life so many times. I haven't tried to kill myself in 3 months thanks to you. It's been hard

since my mom said she didn't want me. My step-dad used to put my head through walls. You are bringing light into my dark world. I can't thank you enough. Please let me know you got this letter; I have depression, anxiety, ADHD, I'm suicidal, etc. You and your music has kept me alive. On one of my lowest days you responded to me on twitter, and it helped me more than anyone will ever know. I want you to know that you saved my life, message me if you can when you get this; meeting you in January changed my life. Thank you for helping so many people, including myself. With the help of you I am one year clean from self-harm; Thank you for everything you do for all your fans, you do so much for us. I know you are too humble to realize it, but you mean so much to thousands of people, and I'm grateful for you. I left you my contact info. Can you let me know you got this." Clearly, Austin could not reply to the thousands of letters, which caused him a tremendous amount of guilt. Austin was understandably overwhelmed by the volume and level of desperation contained in so many of his fan's letters, and he battled with his innate desire to help them all. More importantly, Austin was broken himself, ill-equipped to handle his own demons, let alone the suffering of tens of thousands of others.

It is recognized and unequivocally accepted that Austin used his music fame to inappropriately interact with his fans, and that he took advantage of their vulnerability to satisfy himself. The following is in no way intended to minimize his behavior; rather illustrate that there is another side to the story about Austin and his connection with his fans. Austin deeply appreciated and cared for his fans and routinely went out of his way to try and help them. Austin was connected to his fans because he saw so much of himself in them, their struggle, their depression, their pain. He remembered the first-time music helped him feel less alone, and he wanted to provide that to his fans.

Meeting fans after his shows was a priority for Austin and regardless of how long the line was, he would meet and greet every single person. Austin recalled this often took hours:

> I would sometimes get anxious when I would see how long the line was, but it was important to me. These people cared enough to come to a show and support me financially. I wanted to thank them in person. Although it was tiring, I never thought of it as a hassle. Many of my fans were struggling, and I wanted to do whatever I could to help them. So often my fans would literally hand me razor blades and thank me for motivating them to stop cutting themselves.

Austin's tour manager Ryan had a unique perspective of Austin and the importance of his fans. During an interview he stated:

> When it came to the shows, Austin micromanaged the fan experience from the moment we walked into a venue. He made sure there was enough room for people to stand, made sure the temperature was perfect, every little detail to make sure his fans were happy. After the show he would take pictures and sign autographs and would stay until every last fan got their picture. This was every night, and it lasted for hours, and it was regardless if we had a two- or thirteen-hour drive to our next city. There was nothing more important to Austin than making sure his fans were happy. I remember one time after a show Austin realized one of his fans got her car broken into outside the venue. He helped her get in touch with the police, gave her gas money, and stayed with her for over three hours until she got safely on her way.

During interviews with Robyn and Howard they both recalled numerous occasions where parents approached them after a show telling them how much Austin had helped their daughters. Robyn recalled one time in particular.

> This man came up to me and told me Austin had kept his daughter from killing herself. He saw what was in the media about Austin asking fans for twerking videos, but he said what Austin did for his daughter was more important, and he was thankful for what Austin did to help her.

Austin was genuinely grateful for the fan support at his concerts. Robyn recalled a show that was oversold which resulted in over 100 fans which were unable to enter the venue. In the middle of winter Austin took it upon himself to perform a private concert outside for these fans.

Howard remembered a time when a venue cut Austin's meet and greet line off, and told the fans outside that they would not be able to meet Austin. When Austin was informed of this, he went outside and greeted each and every one of his fans.

In her character reference letter Shelby Webster, a fan who became a close friend to Austin, stated:

> I can't count how many times Austin was there for me when I was feeling down. Austin never let me feel like not living was an option, and he never let me leave a conversation feeling sad. He is one of the most caring and generous people I have ever met. I spent a lot of time around Austin, and I always admired how hard he worked, not just to put on a good show, but to also make sure the fans he met were happy they met him. He has always strongly focused on making everyone in his life, including his fans, happy even if that meant sacrificing a little bit of his own happiness.

In a character reference letter submitted by Lilia Fillipova-Markisic, a mother of a 14-year-old fan, she stated: [1]

> My daughter was a big fan, and we went to all of Austin's concerts in New York. Once we took an extra friend to the concert, but it was sold out. During the meet and greet my daughter asked him, and he personally got us an extra ticket. My daughter reached out to him via social media. She was 14 years old. I have to say I was impressed by the way he conducted himself. She was going through difficult times herself, and his music and her contact with him gave her this "helping hand" that we all need during dark times. He never took advantage, he was what we used to call in the past, a gentleman."

During an interview with Austin's brother Zach he stated the following:

> Austin has always wanted to help others. So many of Austin's fans suffer from depression and suicidal thinking. I would see how he interacted with his fans on social media, much to Austin's burden, he was there for them. He would be that person to talk them off the ledge. He helped so many people, either through his music or direct communication, get through whatever they were struggling with. After shows he would meet every single person, even if it took five hours, to give them a hug if they needed it, to give them an autograph, or listen to their stories.

---

[1] A copy of all character letters, alongside with a copy of this Sentencing Memorandum, will be provided to the Court and to the Government.

It gave him a sense of purpose knowing that he could provide just a little bit of joy or ease someone's pain. "That was everything to him." as stated in Sean's character reference letter:

I have watched Austin interact with thousands of fans. I'd see everything, but more than likely it was a fan who Austin had saved. A person who ended up NOT killing themselves because of my brother. Austin's music speaks to a lot of different people of all ages and walks of life because he's walked a life. Fans would thank him for teaching them that their life is worth living. Young adults handing Austin razor blades, saying that they stopped cutting their own wrists because they found his music. They found someone that understood pain and vacancy in their hearts and minds. Austin was understanding and patient with every single fan and wanted them to know he was grateful for their support of his journey and music. Austin is full of love. He wants to give everyone the things he's lacked in his life. Confidence. Support. Love. Forgiveness. All in a box called "HELP." No one has to go through life alone.

During an interview Austin's best friend, Zoe Foglia, she stated:

Austin has always wanted to help people with his music and his fans were always his top priority. Austin was always polite and genuine when a fan would stop him and ask for a picture or wanted to tell him a story. I have always known him to be kind, caring, and a complete gentleman. My house was a gathering place, and on so many occasions I witnessed girls literally throw themselves at Austin, trying to get him in bed with them, and he always declined."

It is undeniable that Austin, and his music, have changed many lives and often even saved lives. The heartfelt words of appreciation and the level of recognition that so many fans have given Austin for impacting their lives is simply staggering.

As sensational as Austin's rise in the music industry sounds, for Austin it was never about the fame or the money. Music was a passion that provided him with an outlet for his emotions and gave him a sense of worth that he had been missing his entire life. Music pulled Austin out of his misery and gave him a reason to live. Without knowing the depth of Austin's suffering it is

difficult to understand why fame and all the attention that came with it was not enough to cure his depression and low self-esteem.  In Austin's own words:

> A lot of the music and fame felt very good, it boosted my confidence and self-worth and made me feel good, but it was all surface level.  The secret I was carrying was tearing me apart inside.  The music was a distraction, a huge gesture in avoidance and running away from the problems I needed to solve.  When I was alone and not doing music or interacting with other people, I was miserable."

Austin's music was his lifeline and his purpose in life.  He stated:

> For the first time in my life everything that I had experienced, all of the depressing garbage in my past, it all finally seemed like it had a purpose and it was worth pushing through and getting through.  Music was and is the only tangible thing that helped me decide not to end my life.  It means everything to me because without it there is nothing else I have done in my life that has any real meaning.

During an interview Ryan stated:

> Music was Austin's way of controlling his destiny and his way of expressing all of the things he couldn't express to another person.  I think it was easier to express himself to everyone rather than one person.  It was an escape, it was his talent, his drive.  Music is everything to that kid and he is profoundly talented."

The sexual abuse by his father destroyed Austin's soul and left him emotionally shattered. Music helped Austin put some of the pieces back together, but, unfortunately, the damage that had been done was far beyond what music could fix.  His lyrics expose the depth of his pain and the extent of his struggles.  Listening to his music you can hear his cries for help and his desperate self-yearning to understand what was wrong with him.  His song titled, *Damaged Goods,* says it all.  Austin Jones, damaged goods.

### v. Sexual Dysfunction and Offense Behavior

One of the main goals of this position paper is to establish the specific link between the offenses for which Mr. Jones has plead guilty, and the sexual dysfunction he suffers from due to his early-childhood abuse.  In doing so, Mr. Jones is in no way attempting to excuse his conduct.

It is only his hope that, through this analysis, this Court might understand that a lifetime of abuse, repression, mistreatment, and misdiagnosis was a precursor to his criminal conduct. By his own admission Austin was tormented by this secret for so many years. In his own words he explains the complexities behind disclosing his abuse:

> Something that is shameful is very difficult to shine a light on, and it started with admitting to myself that it had happened. Not only did it happen, but it's been the biggest negative impact in my life. I was trying to run from it and I told myself, "I'm super depressed, but it must be because of all the other things because if it is due to this, I am irreversibly damaged."

> I also made a firm decision not to talk about it because I knew how badly I was struggling, and from my perspective my brothers weren't struggling. There were several instances where all three of us were in the bathtub with him, but I assumed since they weren't struggling maybe they didn't remember. They at least didn't seem tormented by the memories like I was. I thought if I talked about it they would have to relive it, and it would destroy them like it was destroying me. Even after years of therapy and working with Steve Eisenberg I still thought I could hide my childhood and fix my behavior by just focusing on the inappropriate behavior.

The sexual abuse Mr. Jones suffered and how it subsequently influenced his behavior is not offered as an excuse for his commission of the instant offense, but rather as a way to understand how the trauma he suffered significantly impacted his life and ultimately led an innocent child down a horrific path of destruction. As indicated in the reports by one of Austin's treatment providers, Jonathan Tlusty:

> During a thorough examination of his past it became evident that Austin had developed symptoms of trauma stemming back to the sexual abuse incurred from the time he was six to ten years old. It should be noted here that until the past year, Austin had never been able to properly process these events and the relating symptoms. Unfortunately, as many survivors of abusive trauma do, Austin had developed strategies to avoid, internalize the behaviors into self-shame and negative self-esteem as well as sensitive mood, sleep difficulty, and depressive symptoms. These symptoms often lead survivors to seek out attention, fulfillment and satisfaction in unhealthy ways in order to momentarily feel "better."

As Austin came to understand and emotionally confront his abuse, he began to see how these past experiences played out in his offending behavior. The negative emotional states led Austin to seek out an escape and a place where he might find control (a feeling that eluded him for much of his life). He also identified the feature of this being somewhat safe, in that he was not seeing his victims face to face. This is significant in that he did not feel safe in other situations where intimacy was involved (again, likely a result of his experiences of abuse). These behaviors then appeared to become cyclical and compulsive. They became an inappropriate means of coping, which is yet another common feature of trauma survivors.

As stated in the report submitted by Mr. Jones' treatment provider, Steve Eisenberg:

It is relevant and significant to point out that while working with sex offenders for 30 plus years, I have gotten to know and understand the characterological deficits, personality flaws, and self-serving rationalizations that are prominent features of sex offenders. I have not seen evidence of these pathological dynamics while working with Austin; rather, his behaviors seem to have been created secondarily from the unfortunate experiences he went through as a child. As a way to combat his depression, Austin went to YouTube for sexual excitement (sexual excitement is a powerful anti-depressant). It is clear that his early childhood experiences impacted his later sexual activities with others. Austin's behavior, soliciting for masturbation, became part of his emotional self-regulation process that developed addictive dynamics that he is now working on reversing.

As a result of his victimization Mr. Jones has had extreme difficulty sleeping most of his life. As noted by his treatment provider, Jonathan Tlusty, as Austin has begun the complicated process of exploring past childhood traumas, it became apparent that Austin struggles with the effects of Post-Traumatic Stress Disorder. As Mr. Jones describes:

Sometimes I have flashbacks. Most nights I can't lay in bed without thinking of my father. I'm laying there with my eyes closed and logically he's not there, but it feels like he is just standing there hovering over me. I am terrified, and I tell myself he's not there. It's a feeling of panic, overwhelming dread, my heart pounding out of my chest. Sometimes I feel like I can't breathe. It takes me hours to fall asleep, and I'm so sick of what I know I'm going to have to visually see when I lay down. I've been sick of it for so long, and that's one of the hugest contributing factors to me wanting to kill myself. I just don't want to see that every single day.

The following excerpt from the book, *The Body Keeps the Score: Brain, Mind, and Body in the Healing of Trauma,* by Bessel Van Der Kolk, M. D[1]., offers additional insight into the psychological effects of trauma and explores the scientific research behind how trauma effects the brain.

The birth of three new branches of science has led to an explosion of knowledge about the effects of psychological trauma, abuse and neglect. Those new disciplines are neuroscience, the study of how the brain supports mental processes; developmental psychopathology, the study of the impact of adverse experiences on the development of mind and brain; and interpersonal neurobiology, the study of how our behavior influences the emotions, biology, and mind-sets of those around us. Research from these new disciplines has revealed that trauma produces actual physiological changes, including a recalibration of the brain's alarm system, an increase in stress hormone activity, and alterations in the system that filters relevant information from irrelevant. We now know that trauma compromises the brain area that communicates the physical, embodied feeling of being alive. These changes help us understand why traumatized people so often keep repeating the same problems and have such trouble learning from experience. We now know that their behaviors are not the result of moral failings or signs of lack of willpower or bad character. They are caused by actual changes in the brain.

Traumatic experiences leave traces. Traces on our minds and emotions, on our capacity for joy and intimacy, and even on our biology and immune systems. Trauma, by definition, is unbearable and intolerable. Children who have been molested become so upset when they think about what they experienced, that they try to push it out of their minds, trying to act as if nothing happened, and move on. It takes tremendous energy to keep functioning while carrying the memory of terror, and the shame of utter weakness and vulnerability.

Long after a traumatic experience is over, it may be reactivated at the slightest hint of danger and mobilize disturbed brain circuits and secrete massive amounts of stress hormones. This precipitates unpleasant emotion, intense physical sensations, and impulsive and aggressive actions. These posttraumatic reactions feel

---

[1] Bessel van der Kolk, M.D., *The Body Keeps the Score: Brain, Mind and Body in the Healing of Trauma (2014).* Bessel van der Kolk is the founder and medical director of the Trauma Center in Brookline, Massachusetts. He is also a professor of psychiatry at Boston University School of Medicine and director of the National Complex Trauma Treatment Network.

> incomprehensible and overwhelming.  Feeling out of control, survivors of trauma
> often begin to fear that they are damaged to the core and beyond redemption.

Understanding what compelled Mr. Jones to engage in the offense conduct is a complex issue, certainly one that we do not claim to fully comprehend.  What is evident is that Mr. Jones was traumatized, and the above excerpt and the information submitted by his treatment providers offer a glimpse into why he committed the instant offense and why he was unable to stop despite the consequences.   Mr. Jones' behavior is exactly as stated above; repetitive, impulsive, incomprehensible and overwhelming.  He admitted feeling out of control and damaged beyond repair.   Based on the extensive research discussed in the above cited book, it is likely that actual changes in Mr. Jones' brain also contributed to the commission of the offense.

### vi.  Remorse for His Past Conduct and Commitment to Exemplary Behavior in the Future

In the government's version of the offense they indicated that during his initial interview with law enforcement Mr. Jones expressed no remorse for what he had done to the victims of his crimes, and suggested the Court consider this when imposing a sentence pursuant to 1B1.4 and 18 U.S.C. 3553(a).

That initial interview took place with Homeland Security at O'Hare International airport on June 12, 2017.  Mr. Jones was returning from a weeklong international tour where he had performed 6 concerts in Germany and Poland.  Having not slept the night before, he arrived at O'Hare completely jet lagged and was met at the gate by law enforcement.  He immediately cooperated with agents, waived his *Miranda* rights and fully accepted responsibility for his actions. During this interview, which lasted approximately two hours, Mr. Jones was physically exhausted and justifiably fearful of what was happening.  In addition, and significantly more relevant, is the notion that without fully understanding the etiology behind his own actions, which would take

months of therapy, it is unrealistic to expect that the very first time Mr. Jones was confronted that he would be able to fully recognize the impact he had on his victims and express remorse.

Mr. Jones has worked tirelessly in therapy to gain an understanding of his behaviors and the impact they have had on his victims. The idea that Mr. Jones is not remorseful for what he has done to the victims in this case is simply not true. Mr. Jones has accepted responsibility for his actions and is extremely remorseful for all the harm that he has caused. Specifically, when discussing the drafting of this memorandum Mr. Jones made the following statement:

> For the last twenty months there isn't a day that goes by that I don't think about the girls that I hurt. The one driving thing that leads me to think about killing myself is what I have done to these girls. Not what I have lost. Several weeks after my arrest I started to get an understanding of the depth and the full scope of the negative impact I had on these girls. I cried every single day thinking about it, and then one night it all really hit me, and I had this wave come over me as I thought, "Oh, my God, what have I done?" I began weeping uncontrollably. It was a full body experience of "holy shit I feel so disgusted in my actions," and I can only imagine how uncomfortable those girls felt not only while it was happening, but how they are going to feel in the future. That my actions have placed a burden on these girls that they never asked for, that they never wanted. It's the thing I'm most ashamed of myself with. I am searching for ways that I can live with myself after all of this and ways I can live with how much I have hurt these people. I wish there was some way that I could make everything right for them and help put them at peace with all of this because I know what it's like to live without having peace. I can't believe I created that in other people. I just don't think they will ever know how truly sorry I am.
>
> Obviously, my actions were very selfish because it was all self-centered, it was about feeding what I needed. I wasn't considering other people. That's the root of the problem. I was completely lost in dealing with all this pain that I had from the past, and instead of taking care of my own wounds I avoided them and started causing pain for other people.
>
> The huge realization of how I effected these girls has brought on a whole flood of emotions, and I am just trying to figure out how to take those emotions and put them into action that's meaningful and productive. There is nothing I can do for them personally. The only way I can at least do something about it is to continue

> treatment to better myself. It will never make it right for the girls. It's just the only thing I can do right now to show that I really do care, and I really do take this seriously. It's no longer about me.

In addition to Mr. Jones' own statement, it is extremely important to consider the findings of his treatment providers in regards to his remorse for his victims. In a report dated March 1, 2019, from Steve Eisenberg, he writes:

> It is relevant and important to note that Austin seems thoroughly pro-social, experiencing what seems to be genuine remorse at having created problems for those involved, including their family members. His continued and ever-present remorse and his interest in doing whatever he can to rectify any damage that has occurred seems authentic, genuine, and sincere.

In a report dated March 12, 2019, from Jonathan Tlusty, he writes:

> Austin has expanded his understanding of the impact he has had on his victims, their families and the community as a whole. He has developed and demonstrated an empathetic understanding of this impact.

In regards to Mr. Jones future, he has an extremely devoted family that will continue to support him when he is released from imprisonment. His mother has faced an incredible amount of tragedies in her life but as usual, she is steadfast and determined to make the best of the situation and help Austin in any way that she can. This case, and the disclosure of the abuse, has shattered this family and yet, brought them closer together as lines of communication have been opened and there are finally no more secrets. In addition to his family, Mr. Jones has his best friend, Zoe Foglia, and her parents, Kym Foglia and Jeremy Wagner, who have been extremely supportive of him since his arrest and are committed to helping him in the future. Zoe has visited Mr. Jones at his residence almost every day for the last two years and has been tremendously supportive to Austin during this difficult time.

**D. Mr. Jones' Commitment to Therapy, Compliance with Pretrial Supervision and the Need to Provide the Defendant with Medical Care or Other Corrective Treatment in the Most Effective Manner (18 U.S.C. § 3553(a)(2)(D))**

As this Court is well aware, Section 3355(a)(2)(D) makes clear the importance of the individuals convicted of crimes to be granted the proper medical care and corrective treatment necessary to ensure rehabilitation. There is not a question that Mr. Jones has shown a full comprehension of the importance of such medical treatment as well. This is underlined by his adherence to his treatment plan and his diligent compliance with the pretrial conditions of his bond.

In 2015, Mr. Jones disclosed to Mr. Torres that he was unable to cease his inappropriate sexual behavior, at which time Mr. Torres referred him to Steve Eisenberg. Shortly thereafter he met with Mr. Eisenberg for the first time in December 2015. They met again in February 2016 and June 2016. In May 2017, a month before his arrest, when Mr. Jones realized his behavior had progressed, he acknowledged that he needed help, and he began to meet with Mr. Eisenberg on a weekly basis. Since that time, Mr. Jones has continued to meet with Mr. Eisenberg weekly since May 18, 2017 and has been extremely committed to therapy.

In regards to Mr. Jones' commitment to treatment in his letter dated March 1, 2019, Mr. Eisenberg offered the following:

> It is important to note that Austin has not missed one single appointment since we began working together almost two years ago. During this time Austin has impressed me as someone who has taken ownership of his faults and weaknesses and who is totally committed to the sustained work necessary to do whatever is necessary to rectify his flaws. He is thoroughly committed to being a decent human being that enhances rather than detracts from the social fabric. It is my professional opinion that Austin does not fit the profile of sex offenders that are a danger to the public welfare, and his prognosis is excellent.

Recognizing that he could benefit from additional therapy Mr. Jones sought out additional counseling and began treatment with Jonathan Tlusty, a Sex Offender Treatment Provider and part

of the Specialized Treatment Team at the Center for Contextual Change. As stated in his letters dated May 15, 2018 and March 12, 2019:

> Austin began weekly individual treatment sessions on August 3, 2017. He has attended every scheduled session since that time. Austin has been engaged, transparent, and hardworking in his exploration of self and his offending behaviors. He has made significant progress in understanding his Cycle of negative behaviors; this task identifies the specific thought patterns, emotional progressions and other behaviors that ultimately lead to one's offending behavior. Austin has incorporated this information in a way that does not excuse his behavior, in fact he continues to struggle with the shame of having committed these acts. However, it does allow him to better understand the very complicated factors that were involved in his behaviors.
>
> His ability to discuss the sexual abuse he experienced in childhood has been a tremendous benefit to him and his prognosis in treatment. Austin has been able to identify key triggers to his behavior including his past trauma history, utilization of several thinking errors, clinically low self-esteem, improperly managed depression and improper use of social media/position as a public figure. Prior to treatment, Austin was unaware of the negative impact these areas of his life had on his functioning. However, now that he has been willing and able to process and understand these aspects of his life, he has been able to make several significant changes already.

Since May 2017, two months prior to his arrest, it is clear that Mr. Jones has been tremendously committed to his treatment and steadfast in his desire to understand the root of his inappropriate behaviors. He stated:

> I am genuinely committed to therapy. I didn't have to go to therapy, but I wanted to do everything I possibly could to take care of my issues. I decided to add a second therapist, and they both bring value to my treatment. Sometimes therapy can be very difficult, but that doesn't mean I am not going to put the work into it. I always go no matter how horrible something we are going to talk about might make me feel.

The important disclosure about the traumatic abuse he suffered as a child has enabled Austin to make significant progress in therapy. As Mr. Jones stated:

> Disclosing the abuse has helped me feel a little more normal with my issues. I have been able to cognitively connect the dots and understand the progression of my behavior and why I fell into that behavior. Understanding why is so important because I was completely lost with knowing why I was doing what I was doing. It took a huge state of vulnerability to open up about the abuse, and now that it's out there it's just like, "I'm here now."

Not only has Mr. Jones shown his commitment to treatment since his arrest, he discussed below his commitment to treatment in the future:

> I wholeheartedly believe in therapy, and I think it's super important to continue treatment regularly. I intend to continue therapy to manage any potential vulnerabilities. I think that therapy is going to be an important part of my entire life.

Mr. Jones has been on home confinement with electronic monitoring for nearly two years. He was released on a secured bond. Shortly thereafter, the conditions of his bond were modified in order for him to obtain part-time employment, 16 hours per week, at the Amazon fulfillment center in Elgin. Mr. Jones excelled at Amazon and was quickly promoted to an ambassador, which included extra training and leadership responsibilities. In her character reference letter Mr. Jones co-worker, Betty Owsiak-Kochanowski, stated, "Austin was always reliable. No matter what was going on personally he was always professional and ready to work. The Austin I know is the friendly kid that was always willing to lend a hand. The Austin I saw was a leader and has potential to grow where his path takes him." On February 15, 2019, Austin received an email from Amazon notifying him that he was placed on paid suspension as a result of his pending federal charges, and on March 5, 2019, his employment was terminated.

Mr. Jones has been in compliance with the highly restrictive conditions of his pretrial supervision. A positive aspect of the lengthy pendency of this case is that the Court has had the benefit of evaluating Austin's ability to maintain compliance with Court orders. We believe that

his compliance is predictive of his future decision-making abilities, his readiness to learn from his past mistakes, and his ability and willingness to be a contributing and positive member of society.

It is absolutely recognized that home confinement allows for significantly more favorable conditions than the MCC; however, two years under the severe restrictions of house arrest is not insignificant. With the exception of the few months of employment, Austin's only permitted time out of his house for the last two years has consisted of two hours of therapy per week. While driving to therapy he is not allowed to make any stops, not even a drive through restaurant. He is not allowed to step foot outside of his house. This highly restrictive home confinement for such a substantial length of time has been difficult; however, Austin has followed the rules diligently for nearly two years.

### E. A Well-Below Guidelines Sentence Will Be Sufficient to Comply with the Factors Set Forth in 18 U.S.C. § 3553(a)(2)(A)

After considering the nature and circumstances of the offense and the history and characteristics of the defendant, the Court is charged with fashioning a sentence that is sufficient, but not greater than necessary—taking into account the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence, protect the public from further crimes of the defendant, and provide defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2)(A)-(D). As an initial matter, counsel has already indicated that both Mr. Jones and his lawyers feel continuing treatment would be an appropriate and imperative component of any sentence ordered.

### i. Nature and Circumstances of the Offense

Mr. Jones does not attempt for a moment to discount the serious nature of the charges of which he has been convicted, nor the harm he has caused as a result of his actions. The ramifications of his sexual misconduct has long-lasting detrimental effects upon the victims and their families. With that in mind, Mr. Jones asks this Court to consider the *circumstances* which led to crimes of such a serious nature. As has been made clear in this memorandum, there can be no question that the systematic devastation of Mr. Jones' psyche at the hands of his father at such an impressionable age helped to create the conditions in which Mr. Jones acted in the manner that he did. While it is no excuse for Mr. Jones' conduct, it is his hope that this Court will consider it as a mitigating factor when deciding its relevance under 3553(a).

### ii. Characteristics of the Defendant

As is the case with any criminal prosecution, the negative conduct of an individual is the focal point of the proceedings. Because of this, it is natural for all parties involved to lose sight of the other characteristics of the person accused of committing crimes. In this case, Mr. Jones happens to be a caring and loving person who has provided joy and happiness to his family, friends and many of his fans. Mr. Jones is not a hardened offender with a criminal past who is completely without moral constraints or a conscience. His remorse for the victims of his crime is real and heartfelt, and he will carry the hurt he inflicted upon them for his entire lifetime.

Although it may seem counterintuitive considering the nature of the instant offense, Mr. Jones has helped a multitude of his fan base confront and overcome their own private demons. In their letters to him they articulate their heartfelt gratitude for making them feel less alone, less emotionally conflicted and less terrified. It is imperative to remember that in some cases Mr. Jones was the reason they chose not to take their own lives. In interviews and letters he is said to be

respectful, supportive, compassionate, selfless and gentle. It is his hope that these characteristics are also given consideration by this Court .

Mr. Jones has made great strides in overcoming the demons that have plagued his life. Many individuals in his circumstances are hurt so badly that their emotional damage is permanent. Mr. Jones has shown great courage and resolve to face these demons, and to work tirelessly to not let them define him. He has come to grips and taken responsibility for the pain he has caused, and his ability to be remorseful and accepting of a need to reinvent himself as a person should not go unnoticed by this Court in fashioning an appropriate sentence.

### iii. The Seriousness of the Offense, Promoting Respect for the Law and Providing Just Punishment

The offense of conviction is a very serious crime which has very real victims. With that reality clearly in focus, it is appropriate to emphasize what has already been pointed out by others in the criminal justice system, which is that respect for the law is promoted by punishments that are fair, not those that simply punish for punishment's sake. It is respectfully asserted that a sentence of 60 months will be sufficiently punitive given the fact that the only sanction available to this Honorable Court is indeed imprisonment. Mr. Jones is a first offender, and the mandatory minimum sentence of imprisonment will have a tremendous impact on him.

### iv. Deterrence in Sentencing

Deterrent sentences are generally those which are effectuated with respect to the offender (personal deterrence) and to others who may find themselves similarly situated (general deterrence). With respect to Mr. Jones himself, the emotional chaos he has brought upon himself and his family has been of crushing magnitude, and a sanction that will remove him from the

community for 60 months is amply harsh and retributive.  It is extremely doubtful that a sentence above the statutory minimum would have any substantive, additional deterrent effect.

It was noted in U.S. v. Baker [445 F.3d 987 (7th Cir. 2006)] that "significant is the district court's finding that a prison term would mean more to Mr. Baker than to a defendant who previously had been imprisoned. Consideration of this factor is consistent with 3553's directive that the sentence reflect the need for `just punishment,' and `adequate deterrence.'  Similarly, in U.S. v. McGee [479 F.Supp.2nd 910 (E.D. Wisc. 2007)] "generally a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served some serious time yet continues to reoffend."

As pointed out earlier, Mr. Jones' therapist has stated that he does not fit the profile of a sex offender who is a danger to the public. By the measure of all known risk-prediction instruments, including the fact that Austin is at low risk to re-offend, it is respectfully asserted that a sentence in excess of 60 months need not be imposed in this case to dissuade him from recidivating.  General deterrence (as a warning to others similarly situated) is supposedly accomplished when harsh punishment is received in public view, but it is also widely accepted as the least effective and least fair principle of sentencing because there is little or no consideration of the unique characteristics of the defendant.

In this instance general deterrence has already been accomplished by the entirety of the judicial process, including the publicity that has been generated, the attendant public embarrassment brought upon Mr. Jones, the ruination of his career, and the certainty of oversight in the community for years to come. Thus, the exercise of discretion when imposing a 60-month

sentence will neither send the implicit message to others that Austin somehow escaped justice nor will it give the green light for others to act in a similar fashion.

### v. The Need to Protect the Public From Further Crimes of the Defendant

As this Court has heard, Mr. Jones' likelihood of reoffending is minimal as long as he continues with his dedication to treatment and rehabilitation. As the letters from his treatment team have shown, there is no doubt that Mr. Jones will continue receiving that treatment upon his release from prison. Furthermore, a sentence to the minimum still limits Mr. Jones' contact with the outside world for a significant amount of time. When combined with the reality that Mr. Jones has conducted himself in an exemplary manner over the past two years, society and the public will be free of any potential negative conduct by Mr. Jones for seven years. This time period is more than adequate to ensure that there will be no danger to any member of Mr. Jones' community both during and after his term of imprisonment.

## V.     Conclusion

In light of the ruinous, life-changing consequences that would otherwise result, a minimal guideline sentence is more than ample punishment for the conduct of Mr. Jones. Mr. Jones is a man who, despite his transgressions and failures, does not deserve to be judged solely based on the offense conduct. Considering Austin's age, background, and the purposes of sentencing set forth in 18 USC 3553(a), it is respectfully restated that a term of imprisonment comprising the statutory mandatory minimum will be more than suffice to meet the Court's primary statutory charge to impose a sentence that is sufficient but not greater than necessary to meet the purposes of punishment, , and public protection. Accordingly, Mr. Jones, through counsel, respectfully requests that this Court impose a sentence of five years' incarceration.

Respectfully submitted,
/s/ Terrence LeFevour
TERRENCE LEFEVOUR


 /s/ David E. Gaeger
DAVID E. GAEGER

I, Terrence LeFevour and David E. Gaeger, hereby certify that on April 18, 2019, I electronically filed the foregoing **Defendant's Clarifications and Objections to the Presentence Investigation Report; And Position Paper and Commentary on Sentencing Factors** with the Clerk of the U.S. District Court for the Northern District of Illinois, Eastern Division, by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

s/ Terrence LeFevour
Terrence LeFevour
Law Offices of Terrance P. LeFevour
190 S. LaSalle Street, Suite 520
Chicago, Illinois 60603
(312) 782-5075
lefevourlaw@sbcglobal.net

/s/ David E. Gaeger
David E. Gaeger
Law Office of Rotunno & Giralamo, P.C.
140 S. Dearborn Street Suite 411
Chicago, Illinois 60603
(708) 615-9400
Law1127@yahoo.com
