UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

     v.

AUSTIN JONES

17 CR 417

Honorable John Z. Lee

## GOVERNMENT'S POSITION PAPER AS TO SENTENCING FACTORS

The UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH, JR.,
United States Attorney for the Northern District of Illinois, hereby submits its
position paper as to sentencing factors.

Defendant Austin Jones used his fame as a popular YouTube musician to
convince his fans, teenage girls, to produce child pornography and to send it to him
using the internet. He used his position as a famous musician to persuade and entice
his victims to send him pornographic videos, promising these girls modeling
opportunities, Instagram followers, and his attention. He preyed on their youth, their
vulnerabilities, and most glaringly, their adoration of him, and he did it over and over
again.

On June 13, 2017, Jones was charged by complaint with two counts of
production of child pornography, in violation of 18 U.S.C. § 2251(a). On January 17,
2019, defendant was charged by information with one count of receipt of child
pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A). That day, pursuant to a
written plea agreement, Jones pleaded guilty to the single count in the information,
and stipulated to the commission of additional offenses and relevant conduct

involving a total of six identified victims, as well as approximately 30 attempts to persuade other girls to send him child pornography.

Based on this conduct, the government concurs with Probation's recommendation and recommends a sentence of 132 months, which is below the applicable Sentencing Guidelines range of 235-240 months' imprisonment, but appropriate in this case due to the mitigating and aggravating factors discussed at length below.

## I.    BACKGROUND AND OFFENSE CONDUCT[1]

### A.    Background of the Investigation

In 2016 and 2017, the National Center for Missing and Exploited Children ("NCMEC") received reports from Facebook that one of its users, Austin Jones, was using his Facebook account to communicate with 14 and 15 year old teenage girls and asking them to send him child pornography via Facebook's private messaging feature and Apple's iMessage service.  Jones is a musician and internet personality who accumulated celebrity and hundreds of thousands of followers on various social media platforms based on the music videos that he posted online of himself performing covers of other artists' music, as well as his own original music.  Jones's primary fan base was teenage girls.

---

[1] Information in this section and throughout this memorandum is based on Probation's Presentence Investigation Report ("PSR") and Sentencing Recommendation, the Government's Version appended to the PSR, the Defendant's Sentencing Memorandum, R. 83 ("DSM"), and materials previously produced to the defense.

In June 2017, Homeland Security Investigations executed search warrants on Jones's home, his Apple iCloud account, and his Facebook account. Jones, using his persona as a famous musician, and under the auspices of conducting "auditions" for models, used his Facebook account to conduct online chats with teenage girls for hours, over the course of days and weeks, and convinced the girls to send him videos of themselves dancing and lasciviously displaying their genitalia, anuses, and breasts. He coached the girls on what to wear, what to say, how to dance, and what to do in the videos, resulting in them sending videos of child pornography to him using either Facebook or Apple iMessage. So that the Court can understand the full breadth of Jones's conduct, his interactions with each of the victims is described below.

**B.    Jones's Conduct with the Victims**

**1.    Victim A**

On or about May 4, 2017, using the private messaging feature of Facebook to converse with Victim A, Jones directed Victim A to make videos of herself dancing in a sexual manner and performing sexual acts, and told her what to do and say in the videos. For example, Jones instructed Victim A as follows:

> JONES: Now you need an intro to the video. At the beginning, get super close and say these lines: hey Austin, it's (name) and this butt is (age) years old and then make it clap[2] for 30 seconds. Got it?
>
> VICTIM A: Ok so this is a real thing and you won't post this anywhere
>
> JONES: Right. I delete them after I score them.

---

[2] Based on the context of the communications, and the content of the videos, JONES used the term "clap" to refer to dancing involving the victim shaking her buttocks repeatedly.

3

VICTIM A: K thank you

Jones also told Victim A, who was only 14 years old, "You must be so happy right now!" and that "we should spice up your outfit!" Victim A sent Jones another video. Jones then instructed her to wear "A hotter top. Maybe hotter bottoms." He instructed her "Stand your phone up on the floor and lean it against the wall. So I can see you from head to toe."

Victim A repeatedly expressed discomfort to Jones with "showing you everything," and Jones continually encouraged her to continue. At one point in the exchange, Jones indicated that he could not hear any "clapping," and Victim A responded that it was likely because her "underwear are really thick in between." Victim A said "Maybe I should get a thong tomorrow," but that "My moms [sic] a little over protective."

Jones and Victim A then had the following exchange:

> JONES: In your honest opinion, do you think your butt is good enough to give guys boners?
>
> VICTIM A: Yes I have given guys boners with it many times
>
> JONES: It hasn't given me a boner yet. That's why I'm concerned.
>
> VICTIM A: Damn it
>
> JONES: I guess try harder!! Add more lines while you bounce if you think that will help

Throughout the conversation, Victim A said that she was tired and did not want to continue. Jones continually encouraged her to "go give me a boner," asked her if she wanted to "try out more" and provided directions, including that she should

4

talk about her age "the whole time," and instructed her to keep dancing and sending her videos.  He explicitly instructed her as follows:

> JONES: Okay. Go make it clap super loud and talk about your age the whole time. Got it?
>
> ***
>
> JONES: Clap it super loud. And say these lines: I'm only (age), yeah only (age) years old, this ass is only (age) years old

Jones also instructed Victim A to delete all the Facebook messages that she exchanged with Jones, so that Victim A's sister, with whom Victim A shared a phone, would not see the messages.

In total, at defendant's direction, Victim A sent to defendant, using the Facebook messaging service, approximately 15 videos of her dancing.  Of the approximately 15 videos, approximately 10 videos depict the lascivious exhibition of Victim A's anus.  Those videos include one video in which Victim A starts the video recording and then proceeds to turn around and get down on her hands and knees with her buttocks exposed. The camera is focused on Victim A's buttocks as she begins to dance and exposes her genitals.  Victim A states, "only 14."

### 2.    Victim B

On or about August 14, 2016, defendant used the private messaging feature of Facebook to converse with Victim B, directed Victim B to make videos of herself dancing in a sexual manner and performing sexual acts, and told her what to do and say in the videos.  Jones and Victim B had the following exchange regarding Victim B's age:

JONES: Wait…. you're 14?

VICTIM B: Yea I'm a youngster

JONES: [Victim B's first name], do you realize how lucky you are?!?!

JONES: I seriously shouldn't even be talking to you….

VICTIM B: Why

JONES: Because you're young

During the conversation, Victim B stated that she was Jones's biggest fan. Jones repeatedly told her that she was "so lucky" to have his attention and that she needed to "prove" that she was his biggest fan.  Jones stated that he wanted to "spank" Victim B, and told her to "[t]hink about how amazing that would be for you!! To have your favorite singer spanking your ass!"  He then said, "If you're lucky, maybe I'd let you suck my dick."  He then instructed her that she would "have to keep proving your my biggest fan though!!!"

Victim B then stated to Jones that she wanted to "make you happy an all but I don't was either of us getting inn trouble over it," to which Jones responded "Of course you can keep making videos! You're doing a great job!  and nothing is going to happen."  Jones then stated that "I guess you really aren't my biggest fan…..ok then." He then threatened to leave the chat unless Victim B would do as he said.  She responded that she would "do as much as I can."

Jones and Victim B then had the following exchange:

JONES: Bounce again and smile at the camera while you bounce.  And while you bounce, say "I'm only 14" 3 times throughout the video

\*\*\*

6

VICTIM B: That works too. I went ahead and put my Nike pros back on so that itd also be easier and I'll just have to have major wedgies for a few minutes lol

JONES: Exactly! Haha. Or you could just take them off . . . whatever is easier

Using Facebook's chat function, Victim B sent Jones a video. Jones responded to Victim B and stated that ". . . in the next one, you have to prove you're my biggest fan. I know you can do it!" Jones and Victim B then had the following exchange:

JONES: Bend over halfway (doesn't have to be all the way), put your left hand on your left butt cheek, and then your right hand on your right butt cheek, and then clap them together!! Repeatedly . . . got it?!"

***

JONES: Instead of clapping them, how about you just spread your cheeks for 10 seconds then. Would that be easier?

***

JONES: Your wedgie has to be good enough so that when you spread your cheeks, it shows the edges of your butthole . . . OMG that would be so funny!

***

JONES: Did your butthole show???

VICTIM B: Not sure lol

VICTIM B: But this wedge is very uncomfortable!!

JONES: Omg then just take them off!!

JONES: Should you just not wear any bottoms at all? Your butthole would look much better then

JONES: I'm just trying to help you! I know you're trying your hardest to prove you're my biggest fan. And I don't want to have to find someone else

7

Victim B then sent Jones a video using Facebook's chat function. Thereafter, Victim B stated that she "wouldn't be comfortable doing it without bottoms on," but offered to make videos to send to Jones the following day while wearing different underwear, "so you'll be able to see through even the lining in the back." The conversation continued as follows:

> JONES: [Victim B's first name], I still couldn't see
>
> JONES: If you really are my biggest fan, you would do it! You're doing so good I need my biggest fan to be confident. It'll be so funny if you do it without them! Like as soon as you spread them, omg. We'll both laugh
>
> JONES: I'm trying to help you so much
>
> JONES: I have to see your butthole to know for sure that you care 100%
>
> VICTIM B: Can I just keep the underwear on until I get to where I bend over and spread my cheeks and then just pull them back up before I stop the video?
>
> JONES: Yes! But spread for a good 15 seconds
>
> *** 
>
> JONES: I bet you had NO IDEA when you met me that just 1 day later you'd get to show me your butthole how special do you feel?!
>
> ***
>
> JONES: Is there any way you can show your butthole and get it closer to the camera??
>
> ***
>
> JONES: Do you know how to flex your butthole??
>
> VICTIM B: Okay lol and no
>
> JONES: Try it! Squeeze your butthole and then unsqueeze it and repeat it a bunch!
>
> VICTIM B: Okay I will try lol, and I will try to get it a little closer too

Throughout the conversation with Jones, Victim B sent to Jones approximately 25 videos depicting Victim B dancing. Of the approximately 25 videos, approximately 8 videos depict Victim B pulling her underwear down and using her hands to spread her buttocks and expose her anus and genitals. These videos included one video in which Victim B is seen wearing a yellow sports bra and black underwear. Victim B proceeds to pull down her underwear, exposing her buttocks. The video then depicts Victim B spreading her buttocks to expose her anus and genitals, and then using one of her hands to rub her anus and genital region.

### 3. Victim C

Between October 2016 and April 2017, defendant used the private messaging feature on Facebook, to direct Victim C to take videos of herself that involved sexually explicit conduct and send them to defendant.

On approximately October 30 to 31, 2016, Jones and Victim C participated in a Facebook chat where Jones instructed Victim C to send him videos using Apple's iMessage service, so that he would receive the videos at a higher quality resolution than he could receive via Facebook.

Jones asked Victim C if she felt "special" because "out of all my fans, I picked you for this opportunity??" Victim C responded that she felt like she was "dreaming," and Jones responded that he was "glad" because "[t]hat means you'll try really hard to get it!!"

On approximately December 19, 2016, Jones and Victim C again communicated via Facebook online chat. During that chat, which Jones described as

a "modeling" opportunity for Victim C, Jones and Victim C had the following

exchange:

> JONES: OMG I just thought of something!!!
>
> VICTIM C: What is it??
>
> JONES: What if you got SO good at modeling that you made me hard?!?!
>
> JONES: And that last one was good!!!
>
> VICTIM C: I mean it's possible
>
> VICTIM C: And thank you
>
> JONES: Bend over and bounce to the back while you smile between your legs!!! Got it?!
>
> JONES: And that should be a goal of yours  ha ha
>
>             \*\*\*
>
> JONES: We have to add talking soon with lines!!!
>
> VICTIM C: Ok lol
>
> JONES: Also here's your line: - hey Austin, I'm only 14 – Say that 4 times during the video got it?!
>
> VICTIM C: Kk!!!!
>
> VICTIM C: While each video sends, I just sit here listening you to on my Spotify
>
>             \*\*\*
>
> JONES: That was good!!! But it's still hard to see your butt
>
> JONES: You sure you don't have a real thong clean?!?!
>
> VICTIM C: Sadly no!!!!!!!!!!
>
> JONES: Pull them up even higher!!!!! And try again.  Bounce harder!!!

JONES: Or just take them off!!! . . . lol jkjkjk you're not that lucky !!!!

\*\*\*

JONES: Here are new lines for the next one:

> – hey Austin, I'm only 14
> – this ass is only 14
> – watch my 14 year old butt bounce Austin!

Repeat those lines twice!! Got it?!?!

VICTIM C: Lol!!!!!!

JONES: Awh that was good!!!! … try it again without the underwear!! Maybe it'll look better … I'll tell you which one does!!

VICTIM C: You sure???

JONES: I'm sure!! Why??

VICTIM C: I was just wondering

VICTIM C: Cause you know my insecurities

JONES: I think you're finally lucky enough to do it

VICTIM C: Yay!!

JONES: You should feel great!!!

VICTIM C: Same lines??

JONES: Yep!!!

JONES: Omg!!! Your butt looks amazing!!! You have such a cute butthole

VICTIM C: Lol!!!!!!!!

JONES: Stay like that!  I'm gonna make you a list to do now!!!
1. Stand up and butt bounce!
2. Stand up and chest pop towards camera!
3. Bend over and bounce hard!
Add you own lines this time!!! You know what to do . . . got it?!?!

11

On approximately April 6, 2017, Jones and Victim C again chatted using Facebook's online service. Jones asked Victim C if she had time for a "list of videos," and Victim C responded that she did not. Several minutes later, Victim C responded that she "ran home and spared 3 minutes" and that she could perhaps "show up to dance a little late." Jones and Victim C then had the following exchange:

> JONES: 1 ass bouncing. 1 boobs bouncing. 1 braces licking. Wear a thong, no shirt at all so I can see your nipples, high socks, and shoes

> VICTIM C: Sounds good

> JONES: You're so lucky I keep giving you so many chances

> VICTIM C: I know. I'm just going through so much right now. I had to fight the urge to cut last night because I promised you I wouldn't do it anymore, and I always keep my promises

> JONES: Good girl

> JONES: Do you remember when you layed your phone flat on the ground? And squatted over it so I could see your butthole?

> VICTIM C: Yeah

> JONES: I need one of that too. With smiling at the camera

At defendant's direction, Victim C took approximately nine videos that depicted the lascivious exhibition of Victim C's anus and sent them to the defendant using Apple's iMessage service; and sent approximately seven videos that involved the lascivious exhibition of Victim C's breasts and buttocks to defendant using Apple's iMessage service.

12

4.      **Victim D**

In April 2017, using the private messaging feature on Facebook, defendant directed Victim D to take videos of herself that involved sexually explicit conduct and send them to defendant.  Jones told Victim D that he had a "modeling opportunity" for her.

> AJ: I might have a modeling opportunity for you….but I have to know that you can make your butt look bigger before I offer anything!
>
> VD: [sends video]
>
> AJ: That was much better!! Wanna hear about the opportunity?
>
> VD: for sureee
>
> AJ: This is top secret, so don't tell anyone!! But I'm launching a clothing line! It's going to be HUGE! And I need an official model for the entire project! Auditions haven't started yet….. but you have a lot of modeling potential! I could let you audition before anyone else!! It's a huge opportunity!!
>
> VD: ohmygoodness that's amazing!!
>
> AJ: Yea it is!! How lucky do you feel?!
>
> VD: incredibly!! thank you so much!!

Jones directed Victim D to put on a "better outfit," including a crop top, high socks, and gym shoes or "combat boots or uggs."  Once she changed, Jones told her to "Stand the camera up on the floor tilting up so I can see you from head to toe."  Jones then gave Victim D a series of "tests," starting with "wiggle your hips side to side while smiling for 30 seconds," then moving her hips "more to get a higher score."  He then said "This will come up in a later test, is your butt bouncy?" before instructing her to "[f]ace the back and make your butt bounce for 30 seconds."  Jones criticized

13

one of the videos that Victim D sent, depicting her flexing her buttocks and using her hands to shake her buttocks, saying "[T]hat was flexing. Try bouncing your heels up and down fast to make it bounce!" He further instructed her to "[l]ean forward while you bounce. And look over your shoulder back at the camera." He asked her, "You really want this, right??"

When Victim D said that she "might have to finish this tomorrow because I have school in the morning," Jones responded that they would do "5 more videos." When Victim D said "tomorrow, right??" Jones responded "No, right now. Then we do the rest tomorrow," and that "I'm taking a huge chance on you. And you don't even seem like you want it[.]" When Victim D sent him an additional video depicting her bouncing up and down, looking at the camera, and saying, "15," Jones responded that "You gotta bounce harder than that! And pull the bottoms up higher!"

Jones asked Victim D "Can you believe you're talking to a singer right now?" Victim D responded that she was also a singer, and that talking to Jones was "surreal."

Throughout this conversation involving "tests," Victim D sent Jones videos of her dancing, per his instructions, including one video depicting her rubbing her breasts, with one breast and nipple exposed.

### 5. Victim E

In March 2017, defendant conducted a chat with Victim E using Facebook's private messaging feature. Victim E told Jones that she was fifteen years old. Jones asked Victim E to send him videos of herself showing her "ass" being "bouncy," and

14

Victim E sent Jones a video of herself shaking while the camera was focused on her buttocks.

Jones then asked Victim E, "Will you bounce for me right now??" Victim E told Jones that she was tired. Jones responded that it was "Too bad you can't make videos right now . . . Cause then we can't find out of if you can make me hard or not!"

Victim E sent eight videos and of herself to Jones, including depictions of her breasts and buttocks.

###    6.    Victim F

In April 2017, using the private messaging feature on Facebook, defendant directed Victim F to take videos of herself that involved sexually explicit conduct and send them to defendant. During their chats, Jones and Victim F discussed how Victim F had gone to one of Jones's concerts, and how Jones wished that Victim F would come to another, saying that he would "invite you into my dressing room! So you could model in person," and "watch me watch you. You would feel so special!" Jones then asked Victim F, "But did you ever think you were this lucky [to be talking to Jones]? Probably not[.] So when would you like to continue your modeling session [Victim F]?"

On August 6, 2016, Jones asked Victim F about her Instagram account:

> AJ: Also, how many followers do you have on Instagram?

> VF: I only hate [sic] 424

> AJ: 424 that's it? Wow. Do you want a lot of followers? Like do you want your photos to get a lot of likes and be a model?

> VF: Hell ya

AJ: If you got the modeling opportunity, you would get thousands for sure

VF: I know I want it so bad

AJ: So when would you like to continue??

VF: Well I'm cooking food for my family rn and then I have to eat with them so maybe after that

In the following days, Jones and Victim F continued to chat on Facebook Messenger. Jones chastised Victim F, saying "you don't really seem that committed" and warning that "I was almost going to let another girl audition to be my model, haha." He then went on to direct her through a "modeling opportunity:"

AJ: This is a really special and big opportunity. Like imagine if your friend that came to the show could do this….she would be NONSTOP messaging me and doing everything she possibly can to be a good model. And I'm just not getting that vibe from you

VF: No I am committed to this I swear like fully committed and I would be texting you all day but I forgot my phone so I couldn't or would've I promise I'm fully committed

AJ: If you're fully committed, then are you ready to continue right now (Victim F's name)?

VF: And when are the auditions

AJ: What you've been doing is apart of your audition. Auditions are done online

VF: Oh okay

AJ: Are you available right now? Or should I find someone else?

VF: No right now is good

Jones then instructed Victim F to put on a tank top, jean shorts, and high socks, and told her that she needed "good make up and hair." Victim F then sent Jones a video of herself, which Jones said needed to be "sexier." He then directed her to send him a series of videos depicting her dancing while bouncing her breasts. Jones further instructed her to say "Hey Austin, it's [Victim F's name] – I'm so lucky you're letting me do this because I'm 15 – watch my 15 year old boobs bounce!"

After Victim F sent Jones a video depicting Victim F bouncing and saying the lines Jones instructed her to say, Jones further instructed her to "pull the top down more to show the tops of your nipples while you bounce" and to state "I'm only 15 – my boobs are huge even though I'm only 15." When Victim F said that her bra covered her breasts, Jones instructed her to remove her bra or to "pull her boobs up above the bra . . . get creative." Jones also asked Victim F if she had any "lace underwear" instead of jean shorts because "You need something to show the bouncing better." Throughout the conversation, Jones demanded that Victim F send him videos via Apple's iMessage service at a rapid pace, in addition to providing them to him via Facebook.

When Victim F said that she needed to leave the conversation, Jones pushed her to make additional videos.

> AJ: Okay. This time go on the floor on your hands and knees. You have to bounce your butt AS FAST AS YOU CAN. Since that takes a lot of effort, the line will be easy. Just say "I'm only 15" over and over and over again. So you can focus on the bouncing
>
> AJ: Got it?

17

Victim F then sent Jones a video of herself on her hands and knew, wearing shorts with "Austin Jones" printed on the back, while dancing and shaking her buttocks, saying "I'm 15." Jones responded to Victim F and continued their chat:

> AJ: You looked great (Victim F's name)!
>
> VF: I'm glad you liked it
>
> AJ: When can we continue??
>
> VF: Later tonight possibly idk
>
> AJ: Are you bailing on me again??
>
> VF: No I don't have to go to the farm tonight I'm gonna be here
>
> AJ: Okay
>
> VF: How many girls are in your additions
>
> AJ: No one else besides you. You have first dibs
>
> AJ: I said, you're all mine
>
> VF: Yayayayay omg I'm so happy rn I literally almost just started crying like I'm so happy
>
> AJ: Good! Well you have to stay committed (Victim F's name)!
>
>             ***
>
> AJ: How bad did you want me to grab your butt at the show? Haha
>
> VF: Grab everything on me not just my ass
>
> AJ: Come to another show. I'll spank you in my dressing room
>
>             ***
>
> AJ: I bet you want me to sit there and watch you dance
>
> VF: Hell ya I do so bad

18

AJ: You probably want me to masturbate while I watch you dance

AJ: Omg that would probably make you so happy and make you feel so special. To watch me doing that while you dance

VF: Yes it would be so much I would love every second

AJ: I bet you want me to cum on you while you dance to

*** 

AJ: How happy would you feel if I let you taste my cum?

At defendant's direction, Victim F took videos of herself doing what he asked her to do, including one video that involved the display of Victim F's breast, and sent it to defendant using Facebook's private messaging service.

### 7. Other Victims

On approximately 30 other occasions, Jones used Facebook's messaging feature to attempt to persuade minor girls to send him videos and photographs depicting the girls' breasts, genitalia, or anal areas, knowing that the girls were under the age of 18.

## C. Jones's Post-Arrest Statement

Jones was arrested on June 12, 2017 at O'Hare International Airport, where he was returning from a concert in Poland. Jones consented to a search of his phone, signed a written *Miranda* waiver, and gave a videotaped statement in which he admitted that he used his Facebook account to have sexually explicit chats with teenage girls, to request and receive videos of child pornography, and to viewing the videos for sexual pleasure. Jones told law enforcement that he had most recently requested a nude video from an underage girl a week prior to his arrest. Jones

admitted that in his conversations with girls, he used his persona as a singer, because he knew that made them feel special. He also admitted that he would carry on conversations for "hours" of him "telling them different things to do." When victims did not want to send him the videos he requested, he would try to "manipulate a way so that they don't feel the need to stop," including making them feel guilty and maintaining friendships with them to discourage them from reporting his behavior. He engaged with them while thinking, "this is wrong and kind of in a way makes it hotter."

Jones told law enforcement that he would ejaculate while engaging in online conversations with his underage victims and viewing the videos that they sent to him.

## II. GUIDELINE CALCULATIONS AND APPLICABLE STATUTORY MINIMUM AND MAXIMUM SENTENCES

The parties agree that the Probation Office has properly calculated Jones's advisory Guidelines range under the November 2018 Guidelines Manual. *See* DSM at 7 (not raising any objections to guidelines calculation in the PSR).

Specifically, the Probation Office determined that the adjusted offense level for Count One is 36. PSR ¶ 61. The adjusted offense level for Stipulated Offense One is 36. PSR ¶ 68. The adjusted offense level for Stipulated Offense Two is 38. PSR ¶ 75. Pursuant to Guideline § 3D1.4, the combined adjusted offense level for the offenses is 41. PSR ¶¶ 76-79. Based on the information now known to the government, the government concurs with the Probation Office's position Jones has demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct within the meaning of Guideline § 3E1.1(a), such that a two-level reduction

in the offense level is appropriate. If the Court agrees with the applicability of that reduction, the government anticipates that it will also move for an additional one-level reduction in the offense level pursuant to Guideline § 3E1.1(b). PSR ¶¶ 81-82. Accordingly, the total offense level is 38. PSR ¶ 83.

The parties also agree that defendant's criminal history points equal zero and his criminal history category is I. PSR at ¶¶ 86-88.

The defendant's advisory guidelines range is 235-293 months. PSR ¶ 139. The statutory minimum term of imprisonment is five years and the statutory maximum is 20 years. PSR ¶ 139. Because the statutory maximum sentence is twenty years, the defendant's guideline range is capped at 240 months. PSR ¶ 139.

## III. THE FACTORS SET FORTH IN 18 U.S.C. § 3553(A) WARRANT A SENTENCE OF 132 MONTHS

The Sentencing Guidelines provide a starting point and initial benchmark for sentencing. *Gall v. United States*, 552 U.S. 38, 49–50 (2007). Although a sentence within the Guidelines range is presumptively reasonable, *United States v. Cano-Rodriguez*, 552 F.3d 637, 639 (7th Cir. 2009), the court must consider the factors set forth in 18 U.S.C. § 3553(a) in determining an appropriate sentence. Considering these factors here, a sentence of 132 months' imprisonment is sufficient, but not greater than necessary, to reflect the seriousness of defendant's offense, promote respect for the law, provide just punishment for defendant's crime, and afford adequate deterrence.

A.      **Nature and Circumstances of the Offense**

1.      **Jones Used his Fame to Prey on His Victims**

Jones repeatedly used his status as a famous musician to get his victims to provide child pornography for his sexual gratification.  He didn't know his victims, and he didn't physically coerce them into doing his bidding.  He didn't have to. Instead, he used the tool that he had at his disposal: his fame.  Jones's victims sent him child pornography because his attention made them feel special, which was exactly what he intended: Jones admitted in his post-arrest statement that in his conversations with girls, he purposely used his persona as a singer because he knew that it made them feel special.  That admission is borne out throughout the chats that he had with his victims, where he repeatedly told them they were "lucky" and "special" to have his attention:

- Jones asked Victim B "do you realize how lucky you are?!?!  I seriously shouldn't even be talking to you  . . . Because you're young."  Jones repeatedly told her that she was "so lucky" to have his attention, that he wanted to "spank" Victim B, and told her to "[t]hink about how amazing that would be for you!! To have your favorite singer spanking your ass!" He then said, "If you're lucky, maybe I'd let you suck my dick."

- Jones also told Victim B, "I bet you had NO IDEA when you met me that just 1 day later you'd get to show me your butthole how special do you feel?!"

- He asked Victim C if she felt "special" because "out of all my fans, I picked you for this opportunity??"  Victim C responded that she felt like she was "dreaming," and Jones responded that he was "glad" because "[t]hat means you'll try really hard to get it!!"

- Jones told Victim C to try dancing with her underwear off, and when she hesitated, he told her that she was "finally lucky enough to do it" and that she "should feel great!!!"

22

- In another chat, months later, Jones told Victim C that she was "so lucky I keep giving you so many chances."

- Jones asked Victim D "Can you believe you're talking to a singer right now?" Victim D responded that she was also a singer, and that talking to Jones was "surreal."

- Jones told Victim D that he was starting a clothing line, and that "Auditions haven't started yet….. but you have a lot of modeling potential! I could let you audition before anyone else!! It's a huge opportunity!!" When Victim D expressed interest, Jones responded "How lucky do you feel?!"

- Jones told Victim F that he wished she would come to another concert, saying that he would "invite you into my dressing room! So you could model in person," and "watch me watch you. You would feel so special!" Jones then asked Victim F, "But did you ever think you were this lucky [to be talking to Jones]? Probably not[.]"

- Later, Jones told Victim F "You probably want me to masturbate while I watch you dance. Omg that would probably make you so happy and make you feel so special."

- Jones instructed Victim F to make him a video of her dancing, topless, while saying "Hey Austin, it's [Victim F's name] – I'm so lucky you're letting me do this because I'm 15 – watch my 15 year old boobs bounce!"

Jones's victims gave him not just the child pornography that he wanted from them, but also the attention that he craved. For example, at one point, Victim C told him "While each video sends, I just sit here listening to you on my Spotify." Victim D told Jones she felt "incredibly" lucky to audition for him, and thanked him for the "opportunity." Over and over, the girls gave him the attention – and the child pornography – that he admitted to the Probation Office that he craved. PSR ¶ 49.

### 2.    Jones Preyed Upon the Insecurities of His Child Victims

Jones asked underage girls for videos because he knew that there was a greater likelihood that they would do what he wanted. He sought out these young girls

23

because they were vulnerable and they could not fully appreciate what he was asking them to do or properly consent to it. He threatened to take away the attention that he was offering them unless they proved to him that they were his "biggest fan." Throughout his conversations with them, he exploited the youth, insecurities, and fears of these girls.

- Jones asked Victim A "In your honest opinion, do you think your butt is good enough to give guys boners?" He told her that "It hasn't given me a boner yet. That's why I'm concerned" and that she should, "I guess try harder!! Add more lines while you bounce if you think that will help."

- When Victim B expressed concern about continuing to dance for Jones and send him videos, saying that she wanted to "make you happy an all but I don't was either of us getting inn trouble over it," Jones responded that "I guess you really aren't my biggest fan…..ok then." He then threatened to leave the chat unless Victim B would do as he said.

- Later in the conversation, when Jones was trying to persuade Victim B to remove the shorts that she was wearing in order to show her anus, Jones told her that "I know you're trying your hardest to prove you're my biggest fan. And I don't want to have to find someone else." When she told him that she "wouldn't be comfortable doing it without bottoms on" and offered to send him videos the next day, Jones responded by saying, "If you really are my biggest fan, you would do it! You're doing so good I need my biggest fan to be confident" and later, "I'm trying to help you so much . . . I have to see your butthole to know for sure that you care 100%."

- Jones told Victim C to dance for him without underwear on, and when Victim C asked if he was sure, Jones responded that he was and asked why. Victim C responded with "Cause you know my insecurities."

- In later chats, Victim C specifically told Jones that she was "just going through so much right now. I had to fight the urge to cut last night." Jones responded by promptly asking her if she recalled when she squatted over her phone "so I could see your butthole."

- Jones asked Victim F how many followers she had on Instagram, and when she told him, he said "…that's it? Wow. Do you want a lot of followers? Like do you want your photos to get a lot of likes and be a

24

model?" When Victim F indicated that she was interested, he told her that "If you got the modeling opportunity, you would get thousands for sure." Later, when Victim F had not sent videos to Jones that he requested, he told her "you don't really seem that committed" and warned that he might get someone else to model for him.

Jones threatened these girls that they weren't sexually desirable enough to keep his attention unless they kept sending him videos. He pushed past cries for help. And he exploited their worries about their bodies. He knew exactly what he was doing and exactly the type of victim that he could use these tools on, and he did so with precision.

### 3. Jones Wouldn't Let His Victims Stop When They Wanted To

In his post-arrest statement, Jones told agents that when his victims wanted to stop talking to him and stop sending him videos, he would "manipulate a way so that they don't feel the need to stop." A review of the chats with his victims shows examples of just how manipulative he was:

- Victim A told Jones that she had to get up early the following morning, but JONES encouraged her to continue for "1 more hour for tonight." After Victim A wrote that "Ok idk I might pass out," JONES asked if she was "giving up" and pressed her to continue and "take this seriously." Throughout the chat, Victim A expressed that she was tired and wanted to stop, and JONES continued to press her to continue and to "work really hard."

- Victim B told Jones that she wanted to "make you happy an all but I don't was either of us getting inn trouble over it," to which Jones responded "Of course you can keep making videos! You're doing a great job! and nothing is going to happen." Jones then stated that "I guess you really aren't my biggest fan…..ok then." He then threatened to leave the chat unless Victim B would do as he said. She responded that she would "do as much as I can."

- When Victim D said that she "might have to finish this tomorrow because I have school in the morning," Jones responded that they would do "5 more videos." When Victim D said "tomorrow, right??" Jones responded "No, right

now.  Then we do the rest tomorrow," and that "I'm taking a huge chance on you.  And you don't even seem like you want it[.]"

When his victims tried to get away from him – when they said they were exhausted, that they didn't want to get in trouble, that they had school in the morning – he did everything in his power to keep them providing him with child pornography.

### 4.    The Harm to Jones's Victims

As of the submission of this memorandum, the government has received one Victim Impact Statement, which has been provided to Probation, the defense, and the Court.[3]  The statement is from Victim E's mother, who described Jones as "a parent's worst nightmare."  And her words illustrate why.  As Victim E's mother describes how she, like all parents, tried to teach her children not to trust strangers:

> But what happens when your child thinks she can trust someone that, to her, isn't a stranger?  She knows almost everything there is to know about him, watches his videos, comments and follows him on social media.  Then one day she gets a message from him asking her to prove she is his biggest fan by doing inappropriate things.

She goes on to explain that her daughter was hesitant, and that Jones persisted even when Victim E was reticent, preying on Victim E's "insecurity with herself."  And Victim E's mother gets right to the heart of what happened: Jones "used his celebrity status to his advantage knowing he could get these young girls . . . to do what he wanted them to do . . . He knew these young girls would do anything for him and sought them out of everyone specifically for this reason."

---

[3] The government anticipates that additional victims and their families will be making statements at the sentencing hearing.

Victim E's mother articulated what happened to her child and her family because of Jones's conduct: "we saw a change in our daughter and now there is a change in all of us." Jones took away Victim E's mother's ability to trust others with her children.

Jones's actions took something from his victims and their families that they will never be able to get back. He sexualized them in a way that cannot be undone, and that burden will remain on his victims and their families for the rest of their lives.

### 5. Mitigating Factors

On the other side of the scale, there are mitigating factors present regarding the nature and circumstances of the offense: Jones has cooperated with the investigation from the outset, agreeing to a post-arrest interview where he admitted to his conduct and consenting to a search of his telephone, where no images of child pornography were found. Jones has been forthcoming with investigators about his conduct.

Moreover, despite Jones's repeated, disturbing directions to his victims to state their ages in the videos they sent him, there is no evidence that Jones distributed the videos that he produced and received. Likewise, there is no evidence that he kept the videos for himself after he viewed them. Jones told law enforcement that he deleted the videos, which was supported by the review of electronic devices seized from Jones's residence and the review of his online accounts.

The videos that Jones caused to be produced, while clearly depicting child pornography, did not include images of babies, toddlers, or very young children; did not depict the sexual assault of children; and did not depict sadomasochistic conduct. There is also no evidence that Jones himself physically touched or abused any child victims.

These mitigating factors weigh in favor of a sentence below the guideline range of 235-240 months. The proposed 132 month sentence appropriately takes into account the seriousness of the offense, while balancing it with these mitigating factors.

**B.  History and Characteristics of the Defendant**

**1.  Mitigating Factors**

The government also recognizes mitigating factors in the defendant's history and characteristics, including his lack of criminal history, close family relationships, and history of self-employment. Sentencing Recommendation at 2. The government also acknowledges that the circumstances surrounding defendant's childhood were difficult, PSR ¶¶ 103-107. These circumstances are discussed more fully below in Section B.3.

**2.  Defendant's Prior History of Seeking Child Pornography**

However, defendant's lack of criminal history is taken into account by his Guidelines range. Moreover, his lack of criminal history is misleading: Jones admitted during his post-arrest statement that he had, in fact, asked for and received child pornography prior to the offense conduct charged in this case. PSR ¶118. Jones

euphemistically described this conduct in his Sentencing Memorandum as a "negative media blast posted on Twitter" that led to people "slamming me on social media," his subsequent depression and suicidal thoughts, hospitalization, and "heartfelt video message" apology. DSM at 27.

That characterization misrepresents Jones's behavior during this incident. During his post-arrest statement, Jones admitted that in 2015, he was publicly accused on YouTube and Twitter of requesting twerking videos from underage girls. He admitted that due to the public backlash against that behavior, he posted a video message to his YouTube page where he apologized to his fans for asking for twerking videos from young girls, but flatly and emphatically denied asking for videos where girls were nude. However, in his post-arrest statement, he admitted that he had in fact asked girls to send him videos in which they were nude.

This conduct was not prosecuted, so Jones is clearly not assessed criminal history points for this behavior. But these events matter for sentencing purposes because these events show that when Jones was publicly outed for the same behavior that he would later be criminally charged with, he still did not stop. Even when he got caught, albeit not by law enforcement, instead of using it as an opportunity to get help, to begin serious mental health treatment, and to *stop producing child pornography*, he continued to lie about and engage in illegal behavior. Despite being publicly accused of asking girls for inappropriate videos, losing his spot on a promising national tour, and ending up hospitalized, Jones was unable to quit. Jones argues that the "publicity that has been generated, the attendant public

29

embarrassment brought upon Mr. Jones, [and] the ruination of his career" that have resulted from this case are factors that this Court should consider in granting him a mandatory minimum sentence. DSM at 47. But Jones *already* experienced those consequences, and they did not matter. The defendant is already, by his own admission, a recidivist.[4]

### 3. Jones's Prior Sexual Abuse

Following his arrest in this case, Jones alleged that he was sexually abused as a child. PSR at ¶ 104. The government recognizes that the defendant suffered physical and sexual abuse at the hands of his father as a child, of which defendant's family and friends were apparently not aware. PSR at ¶¶ 103-105. No child should have to undergo such abuse. But that includes the defendant's victims, too. This abuse is both mitigating and aggravating in this case. Although it is a terrible experience that no doubt affected defendant's life and mental health, as discussed at length in the defendant's Sentencing Memorandum, it is particularly disturbing that, after having been a victim of sexual abuse by his father, defendant went on to perpetuate the victimization of children by causing them to produce child pornography. The defendant made the choice to act on his sexual attraction to

---

[4] The government notes that the defendant's Sentencing Memorandum relies heavily on "information submitted by his treatment providers," "letters" from treatment providers, and references to "risk-prediction instruments" to argue that defendant presents a low risk of recidivism. DSM at 38, 41-44, 47. As of this filing, those records have not been provided to the government. The government has asked the defense to provide those records, and it has indicated that it will do so, but without them, the government cannot fully respond to those arguments now and would request the ability to do so at the sentencing hearing. If the records are not provided to the government and the Court in advance of sentencing, the government would argue that the Court should not consider the unsupported conclusions offered in the defendant's Sentencing Memorandum.

children, participating in hours upon hours of online chats with girls where he preyed on their vulnerabilities and used his fame as a weapon against them, in service of his sexual desires. His pattern of behavior went on for years, and despite what he went through, he inflicted the same harms upon a new generation of victims, which is aggravating. When presented with opportunities to stop, the defendant continued, with a unique appreciation for the harms that it would cause his victims.

Jones argues that the abuse by his father "helped to create the conditions in which Mr. Jones acted in the manner that he did." DSM at 45. But studies and literature have not found any clear causal link between experiencing child sexual abuse and perpetrating such an abuse as an adult. The majority of victims of child sexual abuse do not become perpetrators themselves: "The victim-offender cycle in male sexual abuse has been popularized as an explanation of why some males sexually offend. However, there are serious limitations to this explanation . . . ." Lambie, Ian et al., "Resiliency in the victim-offender cycle in male sexual abuse" in Sex Abuse: A Journal of Research and Treatment 14(1) (2002) at 43.[5]

---

[5] *See also* Glasser, M. et al., "Cycle of child sexual abuse: links between being a victim and becoming a perpetrator" in The British Journal of Psychiatry 179 (2001) at 488 (noting that "the data do not provide strong support for a cycle of sexual substantial proportion of male perpetrators"); and Briggs, F. and R. Hawkins, "A Comparison of the Childhood Experiences of Convicted Male Child Molesters and Men who were Sexually Abused in Childhood and Claimed to be Nonoffenders" in Child Abuse & Neglect 20(3) (1996) at 230 (concluding that "[S]exual abuse at particular ages and frequency of abuse do not of themselves necessarily lead to an increased likelihood of perpetuating abuse across generations.").

### 4. Jones's Conduct with Fans.

The defendant's Sentencing Memorandum also discusses that Jones was "overwhelmed" by "staggering" attention from fans because of his fame, and that some of his fans sought help from him for self-harming. DSM at 28-33. According to Jones, he could not reply to all of these letters, "which caused him a tremendous amount of guilt." *Id*. at 30. Jones also argues in his Sentencing Memorandum that he in fact *helped* many teenage girls, and that he was a "gentleman." DSM at 31-33. The government does not dispute that Jones and his music may have been powerful and positive for some of his fans. But these claims and letters ignore Jones's behavior in this case, and they ignore that he used his charm, his talent, and his fame not just to help, but to harm.

Jones took tremendous amounts of time to groom his victims to get them to send him child pornography. He told law enforcement that "this shit goes on for hours, back and forth of me telling them different things to do." Many of his conversations with the victims unspooled over days and weeks, with chat sessions lasting for hours at a time. For Jones to now claim that he felt tremendous guilt over not being able to respond to more requests for help from his fans is difficult to square with that behavior.

Moreover, the government would draw the Court's attention to Jones's treatment of Victim C, who told Jones that she had previously harmed herself by cutting. Jones's response to Victim C telling him that she was engaging in that behavior was to say "Good girl. Do you remember when you layed your phone flat on

32

the ground?  And squatted over it so I could see your butthole?"  Responding to a child's report that she was "fight[ing] the urge to cut" with an attempt to get her to send child pornography is simply not consistent with the portrait of himself that the defendant is now trying to paint for this Court.

### C. The Need to Reflect the Seriousness of the Offense, Afford Adequate Deterrence, Promote Respect for the Law, Provide Just Punishment, Protect the Public, and Provide Correctional Treatment

Offenses involving children are offenses against those who are the most vulnerable in our community.  Sexualizing children in the manner that the defendant did affects not only the victims themselves, but subjects their families, friends, and communities to the loss of their childhoods.  As Jones points out in his Sentencing Memorandum, "[l]ong after a traumatic experience is over, it may be reactivated at the slightest hint of danger . . . and secrete massive amounts of stress hormones," causing the victim to feel "incomprehensible and overwhelming.  Feeling out of control, survivors of trauma often begin to fear that they are damaged to the core and beyond redemption."  DSM at 37-38.  Jones produced and obtained dozens of videos of child pornography, and attempted to acquire many, many more.  Defendant's sentence should reflect the seriousness of the offense, provide just punishment, and promote respect for the law.

Production and receipt of child pornography are extraordinarily serious offenses that threaten the safety of our children and communities. Congress and the courts have repeatedly reinforced this principle.  The legislative history of the Child Pornography Prevention Act of 1996, Pub. L. No. 104-208, § 121 (codified at 18 U.S.C.

§ 2252A) demonstrates that Congress recognized the destructive impact that the manufacture of child pornography has on the victim: "Congress finds that – . . . where children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years; . . . ." S. Rep. No. 104-358, 1996 WL 506545, § 2(2) (Aug. 27, 1996).

By creating child pornography, defendant perpetuated the victims' abuse and helped to preserve a permanent record of it. As the Seventh Circuit noted in *United States v. Klug*, 670 F.3d 797, 800 (7th Cir. 2012), by manufacturing and then distributing child pornography, "[defendant] caused distinct and serious harm to his victims by giving their images a permanent existence and the potential for endless replication, all of which is beyond the control of the victims." Congress has concluded that this conduct warrants a significant prison term. Many courts have explained why. In *United States v. Goldberg*, the Seventh Circuit reversed the sentence imposed by the district court judge in a child pornography possession case. In so doing, the Seventh Circuit stated,

> The district judge was influenced by the erroneous belief that a sentence affects only the life of the criminal and not the lives of his victims. Young children were raped in order to enable the production of the pornography that the defendant both downloaded and uploaded—both consumed himself and disseminated to others. The greater the customer demand for child pornography, the more that will be produced. Sentences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor. The logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so the more will be produced.

491 F.3d 668, 672 (7th Cir. 2007) (citations omitted).

34

In short, "the 'victimization' of the children involved does not end when the pornographer's camera is put away." *United States v. Norris*, 159 F.3d 926, 929 (5th Cir. 1998). Even had defendant simply possessed child pornography, he "perpetuate[d] the abuse initiated by the producer of materials" because the pornography creates a "permanent record of the children's participation and the harm to the child is exacerbated by their circulation." *Id.* (quoting *New York v. Ferber*, 458 U.S. 747, 759 (1982)); *see Osborne v. Ohio,* 495 U.S. 103, 111 (1990) ("The pornography's continued existence causes the child victims continuing harm by haunting the children for years to come."); *United States v. Sherman*, 268 F.3d 539, 547 (7th Cir. 2001) ("The possession, receipt and shipping of child pornography directly victimizes the children portrayed by violating their right to privacy, and in particular violating their interests in avoiding the disclosure of personal matters."); *United States v. Goff*, 501 F.3d 250, 259 (3rd Cir. 2007) ("Consumers such as [defendant] who 'merely' or 'passively' receive or possess child pornography directly contribute to this continuing victimization. . . . [H]is voyeurism has actively contributed to a tide of depravity that Congress, expressing the will of our nation, has condemned in the strongest terms.").

A custodial sentence of 132 months would have the effect of deterring similar behavior by sending a strong message to the community that those who exploit children and manufacture, transport, and possess such images will receive substantial terms of incarceration. In child pornography cases, in particular, general deterrence is an appropriate consideration for the sentencing court. *See United States*

*v. Mantanes*, 632 F.3d 372, 375 (7th Cir. 2011) (affirming 210 month sentence where 60-month mandatory minimum applied in receipt and possession of child pornography case where the district court judge considered, among other things, the need for deterrence); *United States v. Huffstatler*, 571 F.3d 620, 624 (7th Cir. 2009) (affirming above-Guideline range sentence of 450 months in child pornography production case where the sentencing court considered recidivism, deterrence, the seriousness of the crime, and time for treatment).

Specific deterrence is imperative here. As discussed above, Jones was essentially caught in the same behavior once before, publicly brought to task for it, and despite a period of hospitalization and treatment, went back to producing child pornography. The defendant's statements to the Probation Office that he committed these crimes because he was "mentally intoxicated" with seeing how much influence he had with others, and that he was seeking a "feeling of importance" and "looking for attention," PSR at ¶ 49 are cause for concern. Though it is potentially mitigating that following his period of incarceration, it is unlikely that the defendant will have the level of access to victims that he once had, if his triggers for seeking out child pornography are that he wants attention and to feel important, his risk for recidivism is high.[6] The only way to address the risk defendant poses to children is to remove the defendant from the public so that he has no access to children or child pornography. A significant period of incarceration is needed to protect the public –

---

[6] Again, without the medical records that are referenced in the defendant's Sentencing Memorandum, the government cannot properly respond to Jones's arguments about the risk of recidivism here, and requests to do so at the hearing if the records have been provided.

especially our youngest members – from defendant and to break the pattern of recidivism that he has already demonstrated.

These factors therefore support a sentence of 132 months' imprisonment.

## IV.     RESTITUTION

In paragraph 15 of the plea agreement, defendant acknowledged that pursuant to 18 U.S.C. § 2259, the Court must order restitution in the full amount of the losses sustained by any victim of his offense conduct.

Restitution in this case is mandatory and must be calculated without regard to "(i) the economic circumstances of the defendant or (ii) the fact that a victim has, or is entitled to, receive compensation for his or her injuries from the proceeds of insurance or any other source." *Id.* at § 2259(b)(4)(B)(i).

At sentencing, Jones must be ordered "to pay the victim (through the appropriate court mechanism) the full amount of the victim's losses as determined by the court." *Id.* at § 2259(b)(1). The term "victim" includes each of the victims identified in the plea agreement. The victims' "losses" include:

[A]ny costs incurred by the victim for—

(A)     medical services relating to physical, psychiatric, or psychological care;

(B)     physical and occupational therapy or rehabilitation;

(C)     necessary transportation, temporary housing, and child care expenses;

(D)     lost income;

(E)     attorneys' fees, as well as other costs incurred; and

(F)     any other losses suffered by the victim as a proximate result of the offense."

18 U.S.C. § 2259(b)(3). The government is still in the process of investigating restitution figures for the victims, and the Court has granted the government's request, pursuant to 18 U.S.C. § 3664(d)(5), for an additional 60 days after sentencing to reach a resolution with defendant on defendant's outstanding restitution obligations.

## V.  SUPERVISED RELEASE

Consistent with Probation's recommendation, the government recommends the imposition of a term of supervised release of 8 years. In order to promote the sentencing objectives of deterring recidivism, protecting the public, and assisting in defendant's rehabilitation and reintegration into society, the government supports Probation's recommendation that the term of supervised release include the conditions set forth in the PSR. It is particularly important that the defendant receive mental health treatment.

## VI.    CONCLUSION

For the reasons set forth above, the government respectfully requests that the Court sentence defendant to a sentence of 132 months' imprisonment.  This sentence is sufficient but not greater than necessary to reflect the goals of sentencing set forth in 18 U.S.C. § 3553.

Dated: April 25, 2019                       Respectfully submitted,

                                            JOHN R. LAUSCH, JR.
                                            United States Attorney

                              By:    */s/ Katherine Neff Welsh*
                                            KATHERINE NEFF WELSH
                                            Assistant United States Attorney
                                            219 South Dearborn Street, 5th Floor
                                            Chicago, Illinois  60604
                                            (312) 886-2061