1

```
 1                  IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3   UNITED STATES OF AMERICA,        ) Docket No. 17 CR 417
                                      )
 4                        Plaintiff,)
                                      )
 5                  vs.               )
                                      )
 6   AUSTIN JONES,                    ) Chicago, Illinois
                                      ) July 25, 2019
 7                       Defendant.) 1:37 o'clock p.m.

 8      TRANSCRIPT OF PROCEEDINGS - MOTION & RESTITUTION HEARING
                  BEFORE THE HONORABLE JOHN Z. LEE
 9
     APPEARANCES:
10
     For the Plaintiff:          HON. JOHN R. LAUSCH, JR.
11                               United States Attorney
                                 BY:  MS. KATHERINE NEFF WELSH
12                               219 S. Dearborn St., Suite 500
                                 Chicago, Illinois  60604
13
     For the Defendant:          LAW OFFICES OF TERRENCE P. LeFEVOUR
14                               BY:  MR. TERRENCE P. LeFEVOUR
                                 190 South LaSalle Street, Suite 520
15                               Chicago, Illinois  60603

16   Also Present:

17     For Kym Foglia:           GRUSZECZKI & SMITH
                                 BY:  MR. MICHAEL GRUSZECZKI
18                               33 North Dearborn Street
                                 Suite 1950
19                               Chicago, Illinois  60602

20     For Victim F's Father:    JONES DAY
                                 BY:  MS. TAYLOR M. GRODE
21                                    MS. ALLISON McQUEEN
                                      MS. EMMA J. LANZON
22                               77 West Wacker Drive, Suite 3500
                                 Chicago, Illinois  60601
23

24

25
```

```
1   APPEARANCES (Cont'd):

2   Court Reporter:              MR. JOSEPH RICKHOFF
                                 Official Court Reporter
3                                219 S. Dearborn St., Suite 1224
                                 Chicago, Illinois  60604
4                                (312) 435-5562

5              *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

6                        PROCEEDINGS RECORDED BY
                         MECHANICAL STENOGRAPHY
7                    TRANSCRIPT PRODUCED BY COMPUTER

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1           THE CLERK:  Case 17 CR 417, USA vs. Jones.

2           MS. WELSH:  Good afternoon, your Honor, Katherine

3   Welsh for the United States.

4           MR. LeFEVOUR:  Good afternoon, your Honor, Terrence

5   LeFevour on behalf of Mr. Jones.

6           MR. GRUSZECZKI:  Good afternoon, your Honor, Mike

7   Gruszeczki on behalf of Kym Foglia.

8           THE COURT:  Good afternoon.

9           So, this is the restitution hearing, where the Court

10  has to determine the appropriate amount of restitution that

11  should be entered in this case in order to compensate the

12  victims for their losses.

13          I reviewed the government's request for restitution,

14  as well as the defendant's response to the government's

15  request.  I'm happy to hear argument.  I'll let the government

16  go first.

17          At this point, does the government intend to present

18  any testimony today?

19          MS. WELSH:  Your Honor, the government itself does

20  not intend to present any testimony.  However, as noted in the

21  government's request for restitution, Victim F and her father

22  are represented by outside counsel in this matter now.

23  They've asked for the opportunity to address the Court today.

24  And they've also asked for the opportunity for Victim F's

25  father to make a statement to the Court regarding restitution,

1    as well.

2              And if it's all right with your Honor, I would defer

3    to his attorneys that are representing him here today, as far

4    as discussion of those issues that are pertinent to Victim F.

5              We've also submitted to the Court their submission to

6    the government.  That was attached as Exhibit A to the

7    government's request for restitution.

8              THE COURT:  Okay.

9              I also understand that the defendant is objecting to

10   any testimony today from any of the victims or Victim F's

11   father.

12             Is that correct?

13             MR. LeFEVOUR:  I'm not objecting to testimony, Judge.

14   What I was objecting to was a narrative statement by the

15   victim's father or any other lawyer making a request.  I

16   believe it devolves to the government.

17             So, obviously, if it was in the form of testimony, I

18   think that that would be appropriate.  But since it was clear

19   from the government's filing that there was going to be no

20   testimony, that is why the defendant objected.

21             MS. WELSH:  Your Honor, to that point, it's the

22   government's position here that the same statute that applies

23   that allows victims, their legal guardians, their legal

24   representatives to address the Court at sentencing, the Crime

25   Victims Rights -- excuse me, the Crime Victims Relief Act, 18

1  U.S.C. Section 3771, because this is part of the final

2  judgment against the defendant, it's the government's position

3  that that statute applies here, and that his representatives

4  and the victim's father can address the Court accordingly.

5          THE COURT:  Okay.

6          I will hear from them during these proceedings, and

7  I'm going to overrule the defendant's objection.

8          So, why don't we do this:  Let me hear -- I'll give

9  an opportunity for the government, Ms. Welsh, to make a

10  statement for the record; and, then, I'll hear from

11  Mr. LeFevour; and, then, I'll go ahead and hear from the other

12  counsel.

13          And you represent Victim F; is that correct?

14          MR. GRUSZECZKI:  No, your Honor.

15          We had filed a motion on behalf of Kym Foglia, who

16  had posted -- or at least had given -- the money to Robyn

17  Scurek, who posted bond, as far as the restitution was

18  concerned.  We had a motion for the release of bail.  That's

19  our only --

20          THE COURT:  Is there any objection to that?

21          MS. WELSH:  Your Honor, the government -- this is at

22  Docket Entry 105.  It's a motion to release bond.

23          What happened here was that, I believe, a family

24  friend of the defendant's mother gave her the cash,

25  essentially, to post bond for the defendant.  She then used

1    that money to post bond.  She is listed on the documentation
2    from the Clerk's Office as the surety.
3         And, so, when a third party posts bond for the
4    defendant, the government cannot then seek to use that money
5    to apply to restitution.  That only happens when it's the
6    defendant him or herself that post the money.
7         So, the government's position here is that we cannot
8    seek those funds to apply to restitution.  We take no position
9    on this motion to return the funds to the family friend.  But
10   we do think it's appropriate that your Honor order that the
11   cash bond be released to Ms. Scurek, who is listed as the
12   third party on the paperwork with the Clerk's Office.
13             THE COURT:  Okay.
14             Mr. LeFevour, anything to add to that?
15             MR. LeFEVOUR:  Judge, other than the fact that I have
16   personal knowledge of the items cited in the motion and I
17   believe those to be true, take no other position.
18             THE COURT:  All right.  Very well.
19             The motion by Kym Foglia --
20             MR. GRUSZECZKI:  Yes, your Honor.
21             THE COURT:  -- for release of bond is granted.  The
22   amounts will be released to -- I believe it's Robyn Scurek; is
23   that correct?
24             MR. GRUSZECZKI:  That's correct, Judge.
25             THE COURT:  All right.

1          So, the Clerk will be directed to release the amounts

2   to Robyn Scurek.

3          MR. GRUSZECZKI:  Thank you, your Honor.

4          THE COURT:  Thank you.

5          MR. GRUSZECZKI:  May I be excused?

6          THE COURT:  Yes, you may.

7          MR. GRUSZECZKI:  Thank you, Judge.

8          THE COURT:  So, Ms. Welsh, let me hear from you.

9          MS. WELSH:  Okay.  Thank you, your Honor.

10          THE COURT:  Mr. LeFevour, you can have a seat if

11   you'd like.

12          MR. LeFEVOUR:  I'm okay.  Thanks, Judge.

13          MS. WELSH:  I'll keep my remarks brief, I think, your

14   Honor, because I think it's pretty much outlined in the papers

15   that I've submitted to the Court.

16          What we have here, I think, are some pretty -- I

17   think there's two categories of restitution here.  There's

18   things that are pretty straightforward, and I think they've

19   been agreed upon by the defendant.  So, there shouldn't need

20   to be, I think, any argument here today.

21          Those concern specific requests for restitution for

22   past medical treatment that's been incurred by Victim B and

23   Victim E.  For Victim B, that was an amount of $732.60.  That

24   was for past mental health counseling and treatment, as well

25   as, I think, mileage to and from those appointments.

1          The amount for Victim E was $360, that was requested

2     for restitution for past mental health treatment.

3          I think there's no objection to those amounts by the

4     defendant.  And, so, the government is asking that the Court

5     order those amounts.

6          What I do think that leaves on the table is the issue

7     of restitution for prospective medical treatment.  As noted in

8     the government's request for restitution, it's the

9     government's position here that -- the Court presided over the

10    sentencing hearing.  The Court his listened to a number of

11    victim impact statements, read both by the victims themselves

12    and by their families.  They were, I think everyone would

13    agree, very moving and very illustrative of the damage that

14    these crimes have caused to these victims.

15         Based on a review of the case law in this area, the

16    evidence that was presented at the sentencing hearing and the

17    applicable statutes, it's understandable that these victims

18    are going to require mental health treatment to get over these

19    issues, for an extended period of time.

20         And based on a review of the social science

21    literature and the case law, it's the government's position

22    here that a reasonable number is the ten thousand, I think,

23    five hundred and thirty dollars that was requested for future

24    mental health treatment for each of these victims.

25         The way that the government arrived at that number

1 is -- as I said, it's based on the case law that's cited in

2 our brief; it's based on the social science literature that's

3 attached at Exhibit B in our brief; and, it's based on sort of

4 what was reported by the victims as far as the damage that's

5 been done to them.

6        And, so, based on all those factors, it's the

7 government's position that that is a reasonable request for

8 mental health and other physical health treatment going

9 forward.

10        THE COURT:  And that's the $10,530?

11        MS. WELSH:  That's right, per victim.

12        THE COURT:  Okay.

13        There's also -- the government makes a statement at

14 the end of its memorandum with regard to Victim F's request

15 and how the Court should consider the categories of requests

16 that Victim F is seeking.  And I have to say, the last page --

17 and perhaps this was crafted to be this way -- doesn't quite

18 provide me with a clear picture of the government's position

19 as to Victim F's request.

20        As a general matter, is the government's position

21 that future prospective earnings, to the extent that they can

22 be proven by a preponderance of the evidence and substantiated

23 by social science literature, qualifies as a loss under the

24 statute?

25        MS. WELSH:  Your Honor, the government's position is

1     that once -- based on the case law in the Seventh Circuit,

2     once the parties start getting into the issue of these

3     prospective losses, it becomes very difficult to figure out

4     what that number is for any number of reasons.  You know, as

5     quoted in the case -- as cited in the case law, this isn't a

6     full-blown trial.  We don't have all those tools at our

7     disposal.

8           At the same time, Congress has sort of put a problem

9     in the Court's lap that says that restitution is mandatory and

10    you need to try to make these victims whole.

11          That sort of requires a little bit of a crystal ball

12    on the Court's part and on the government's part, as well.

13          THE COURT:  Because I'm supposed to consider not only

14    past costs or losses, but also reasonably ascertainable

15    future or prospective losses that could be reasonably

16    attributed to the crime.

17          MS. WELSH:  Exactly, your Honor.  And I think that

18    that is -- it's a difficult question to answer for anyone.

19          I would say that perhaps at this juncture, it might

20    be appropriate to hear from Victim F's counsel, who I think

21    might be prepared to address some of these issues for your

22    Honor; and, then, perhaps after they've had the opportunity to

23    address that with the Court, if I could follow up.

24          THE COURT:  That's fine.

25          Mr. LeFevour, you can have the advantage of hearing

1    everyone before you give your response.

2          MR. LeFEVOUR:  Thank you, Judge.

3          MS. WELSH:  Thank you, your Honor.

4          THE COURT:  So, who is going to be speaking on behalf

5    of Victim F?

6          MS. WELSH:  I believe three of his attorneys are

7    here, if they can introduce themselves to the Court and put

8    their names on the record, your Honor.

9          THE COURT:  Very good.

10          MS. GRODE:  Good afternoon, my name is Taylor Grode

11    on behalf of Victim F.

12          MS. McQUEEN:  Allison McQueen on behalf of Victim F.

13          MS. LANZON:  Emma Lanzon on behalf of Victim F.

14          MS. McQUEEN:  Good afternoon, your Honor, I'll begin

15    by giving just a brief overview of how we came to our

16    calculation for the sake of clarity, and then we'd be happy to

17    answer any questions you may have clarifying any of the

18    aspects of our request.

19          THE COURT REPORTER:  Excuse me, you're going to have

20    to slow down.

21          MS. McQUEEN:  Okay.  Sorry.

22          THE COURT REPORTER:  A lot.

23          MS. McQUEEN:  I will.  Thanks.

24          THE COURT REPORTER:  Thank you.

25          THE COURT:  We're not going anywhere, so you can take

1  your time.

2          MS. McQUEEN:  Thank you.

3          As Ms. Welsh already explained, and as the defendant

4  agreed in Paragraphs 15 and 16 of the agreement, restitution

5  is mandatory in this case under both the SECA and MVRA.

6  Unlike the --

7          THE COURT:  All right.  So, if you're going to be

8  reading something, you really do need to slow down.

9          MS. McQUEEN:  Okay.

10          THE COURT:  Okay?

11          MS. McQUEEN:  Sorry.

12          THE COURT:  Just because it's going to be difficult

13  for Mr. Rickhoff to get everything that you're saying on the

14  record.

15          MS. McQUEEN:  I understand.  Sorry about that.

16          THE COURT:  That's okay.

17          MS. McQUEEN:  With respect to the SECA, the guarantee

18  for an award of restitution for child sexual exploitation

19  victims became even stronger in December of last year with the

20  passage of the Amy, Vicky and Andy Child Pornography Victim

21  Assistance Act.

22          THE COURT:  So, let's try this:  Pretend that you're

23  reading a story to first graders.

24          MS. McQUEEN:  Okay.

25          THE COURT:  No, seriously.

1          MS. McQUEEN:  I understand.

2          THE COURT:  It's not that we're first graders, but

3    that's going to help you slow down.  Because what happens is

4    you tend to start slow and then you speed up, which is fine.

5    Just slow it down, please.  Okay.

6          MS. McQUEEN:  Understood.

7          THE COURT:  All right.

8          MS. McQUEEN:  Thanks, your Honor.

9          When the Act was signed into law in December, it now

10   allows child pornography victims to receive a lump sum of at

11   least $35,000 in restitution.  As amended by the Amy, Vicky

12   and Andy Act, the SECA now provides that the defendant shall

13   pay the full amount of the victims' losses that were incurred,

14   or that are reasonably projected to be incurred in the future,

15   by the victim as a result of the trafficking in child

16   pornography.

17          The statute goes on to lay out compensable losses,

18   which include medical costs, transportation, lost income, and

19   any other relevant losses incurred by the victim.  Prior to

20   the passage of this Act, the SECA did not explicitly provide

21   for the payment of future losses, and it did not include this

22   open-ended authorization for any other relevant losses

23   incurred by the victim.

24          I'll also note from the outset that our calculation

25   accounts for both losses incurred and reasonably projected to

1    be incurred by Victim F and losses incurred by her father

2    because both the SECA and the MVRA include the legal guardian

3    of a victim who's under the age of 18 in their definition of

4    the term, and a number of courts have compensated family

5    members for the losses under the SECA.

6         And as I go through our calculation, your Honor,

7    please feel free to let me know if you have any questions.

8    I'd be more than happy to clarify exactly what section of the

9    SECA and the MVRA authorize compensation for the costs that

10   we've included in Victim F's restitution calculation or to

11   provide case law supporting our request.

12        So, the first item we've included, your Honor, is

13   lost income in the amount of $19,794.  Victim F's father, who

14   is present here today, missed a significant amount of work in

15   order to care for his daughter.  Our lost income calculation

16   accounts for one month that he spent with Victim F in the

17   hospital in spring of 2017, time spent bringing Victim F to

18   and from at least 264 individual family and outpatient therapy

19   appointments between August 5th, 2016 -- when she met Jones --

20   and her 18th birthday.

21        It also includes time spent with therapists during

22   Victim F's three stays in mental health institutions in the

23   spring of 2017, and time spent traveling to and from Chicago

24   in order to attend the sentencing hearing in May.

25        We've also included a request for $26,000 for a lost

1    profit share.  In addition to the loss of his baseline salary,

2    Victim F's father also lost the opportunity to earn a

3    significant additional share of his family business' profits

4    between August, 2016, when Victim F met the defendant, and

5    October, 2018, when Victim F turned 18.

6            THE COURT:  How is that calculated?  I mean, how --

7            MS. McQUEEN:  The lost profit share?

8            THE COURT:  Yes.

9            How would he get the lost profits if he were working?

10           MS. McQUEEN:  Your Honor, the -- so, as he can

11   explain for you himself, Victim F's father is a tattoo artist.

12   It's a family business as he describes it.  It's a luxury

13   good.  So, given the fact that in any time he was -- spent not

14   working and instead caring for his daughter, he could not be

15   there providing that service and adding to his business'

16   profits.

17           It isn't, obviously, the type of business where he

18   could sit in the waiting room while his daughter was in

19   therapy and continue working.  He needed to be physically

20   present at work.

21           And he has earned up to approximately $12,000 a year

22   in those annual profits.  So, we calculated that number by

23   determining that given that the overall annual profits are

24   $12,000, assuming then divided by 12, that would be about

25   $1,000 a month in annual profits.

```
1              THE COURT:  Well, no, I guess my question becomes

2    part of your loss strategy -- or the loss calculation -- is

3    lost income, right?  And you say that as part of lost income,

4    it's because he couldn't work because he had to stay with his

5    daughter at the hospital stays and accompany her to therapy

6    appointments.  And I understand all that.

7              But what I'm trying to understand is how is the lost

8    profits, how is that different from his lost income; and, if

9    it is different, how does the company that he works for

10   calculate the annual profit share so that you can arrive at

11   the figure of 26,000 that you arrived at?

12             MS. McQUEEN:  Certainly.

13             So, your Honor, just as a waitress, for example,

14   would have her base salary and then make tips on top of that,

15   Victim F's father has his base salary, which we used to

16   calculate all of that lost income for the time that he spent

17   caring for his daughter.  On top of that, he would otherwise

18   have received this profit share in his family business, which

19   -- he can correct me if I'm misunderstanding when he has an

20   opportunity to address the Court, but my understanding is it's

21   divided between himself and his father, who he co-owns the

22   business with.

23             So, that is where he comes to the figure of getting

24   approximately $12,000 per year; and, then, accounting for the

25   26 months that -- between the time that Victim F met the
```

1    defendant and her 18th birthday.

2            MS. GRODE:  And, your Honor, I would also add that we

3    are viewing -- so, the statute says lost income.  And we

4    believe that the base salary is lost wages and this is also

5    part of that lost income.

6            So, something like commission or tips.  It's

7    something that he gets taxed on every year.  So, that's how he

8    has -- he knows how much extra he made every year.

9            THE COURT:  Okay.

10            And, so, what he's saying is because he couldn't

11    work, the business was less profitable; and, because it was

12    less profitable, his portion of profit share was less than it

13    otherwise would have been?

14            MS. McQUEEN:  That's correct, your Honor.

15            THE COURT:  Okay.

16            MS. McQUEEN:  The next item we include in our

17    calculation is travel expenses in the amount of $3,208.57.

18            THE COURT:  Okay.

19            You can go through -- you can go to the next one.  I

20    understand that.

21            MS. McQUEEN:  Okay.

22            The next item is Victim F's future expenses.  Because

23    the SECA now explicitly provides that child pornography

24    victims should be compensated for the full amount of their

25    losses that are reasonably projected to be incurred in the

1    future, we also included these reasonably anticipated expenses

2    in our calculation.  The first item is future medical

3    expenses.

4            As the government already laid out, these --

5            THE COURT:  No, I understand the argument for future

6    medical expenses.

7            Talk to me about future losses.

8            MS. McQUEEN:  Certainly.  Just to provide the

9    baseline, and then I will defer to my colleague Ms. Grode.

10           In addition to the medical expenses, a number of

11   studies have shown that victims of childhood sexual abuse

12   suffer from a wide range of lifelong adverse health, social

13   and economic consequences.  And the goal of the SECA and the

14   clear intent of its language is to broadly encompass all of

15   those expenses.

16           The most recent and comprehensive study on this

17   topic, the Letourneau study published in 2018, which we

18   included as part of our submission, determined that the

19   lifetime cost for a female victim of child sexual abuse is

20   over $280,000.

21           Excluding the personal and societal costs included in

22   that study that are inapplicable to Victim F, we can

23   realistically estimate that her future expenses will be at

24   least $253,850.  That number includes both her future medical

25   expenses, which are projected forward in that same study, and

1    also productivity losses and costs associated should she have

2    future suicide attempts.

3           I'll defer to Ms. Grode.

4           MS. GRODE:  So, I do want to address the government's

5    position.  We believe that the Seventh Circuit actually does

6    allow for lost future income in this context.  So, the cases

7    that the government brought up, we believe it actually

8    supports our view.

9           So, first, the Danser case that the government

10   discusses, this reference is in one footnote in the Danser

11   case.  It's in dicta.  And they're citing U.S. vs. Fountain,

12   which is a case from 1985 that is actually not about SECA.

13   It's about the Victim and Witness Protection Act.

14          And, so, there the Court noted that the restitution

15   order -- there's a specific statutory directive in the Victim

16   and Witness Protection Act that says that the order shall not

17   unduly complicate or prolong the sentencing process.  So, that

18   was a consideration that the Fountain court used in

19   determining that these lost wages shouldn't be a part of

20   restitution under that statute.

21          And, so, SECA is a different statute.  It's a

22   different context.  And it has the statutory directive here to

23   award the full amount of the victim's losses.

24          Also, further, the Danser case was in 2001, and this

25   was obviously well before SECA was amended just last December.

1    And that is when it explicitly provided for all future losses

2    and, also, the catch-all provision that's included in the

3    statute.  So, those were just new additions that were not

4    considered in the Danser case.

5          And, then, also another case that the government

6    cites -- another Seventh Circuit case -- is Laraneta.  And,

7    so, there that court actually recognized future earnings as

8    lost income.

9          So, the government cites it in the context of talking

10   about the "Other Losses" category, and they say that the

11   future lost earnings is not in that list.  But that is also

12   because the court there specifically recognized the future

13   earnings as lost income and says future lost income is

14   specifically contemplated under SECA.

15         And I could read the -- I have a quote that

16   illustrates this.  They say, "The losses for which the two

17   women, for they are now adults, sought and received

18   restitution in the district court included incurred and

19   expected costs of therapy, lost and expected to be lost income

20   because of psychological damage that impairs their ability to

21   work, and other items, all within the specific statutory

22   definitions of victims' compensable losses."  And that is on

23   Page 988 of that.

24         So, our position here is that the Court should follow

25   the Seventh Circuit's interpretation of SECA and Laraneta

1    rather than this footnote in Danser, which is over a decade

2    older than the Laraneta case.  It doesn't take into account

3    the recent amendments to SECA, and it relies on another case

4    that analyzed a different statute.

5            THE COURT:  When was SECA amended again?

6            MS. McQUEEN:  December 7th, 2018, your Honor.

7            THE COURT:  Can I apply the amendments to this case

8    given the fact that the conduct took place prior to the

9    amendment?

10           MS. McQUEEN:  Certainly, your Honor.  The only item

11   that we're aware of that the government believes wouldn't

12   apply in the current version of the statute -- which went into

13   effect last December -- is the reserve for victims for

14   restitution purposes, which guarantees that $35,000, which we

15   simply presented to the Court as something for your reference

16   as a baseline of what's now expected that victims of child

17   pornography are entitled to recover.

18           MS. GRODE:  I would also add that that did make an

19   additional context; but, also, setting that aside, the

20   Laraneta case was in 2012.  So, it was before this.  It is

21   just a more recent case on this issue that states the Seventh

22   Circuit's position versus in Danser it was in a footnote kind

23   of mentioned.

24           THE COURT:  Okay.

25           MS. McQUEEN:  Your Honor, the final item that we've

1   included in our loss calculation is a quality of life loss.

2   We recommend that the Court compensate Victim F for the loss

3   she's already suffered in the quality of her life, which I

4   hope was clear both from our submission and from her statement

5   before the Court at the sentencing hearing in May.

6          The Letourneau study that I described earlier

7   determined that female victims of child sexual abuse

8   experience a quality of life loss in the amount of $41,000

9   over the course of their lifetime.  And as we've already

10  explained, as amended by the Amy, Vicky and Andy Act, the SECA

11  now provides that courts should consider any relevant losses

12  incurred by the victim when determining the amount of

13  restitution.

14         THE COURT:  All right.  So, I've reviewed the

15  Letourneau article, as well as an earlier article that was

16  cited in your submissions by Fang, Brown, Florence, and Mercy

17  that's in Child Abuse and Neglect 36, 2012.

18         MS. McQUEEN:  Un-huh.

19         THE COURT:  And it appears that to arrive at the

20  figure that you did for this future losses, you relied on

21  Table 1 of the 2018 article; is that correct?

22         MS. McQUEEN:  That's correct, your Honor.

23         THE COURT:  Okay.

24         So, the issue I have with Table 1 is several-fold.

25  First of all, it seems to me that for some of those numbers

1    that are listed on Table 1, what the authors are trying to do

2    is they're trying to calculate not the loss to the victim, but

3    the overall economic impact to the United States generally

4    that child sexual abuse would have.

5         And, so, in the introduction they say, "The present

6    study aims to estimate the U.S. economic impact of child

7    sexual abuse."

8         And, so, if you look at something like -- if you

9    disaggregate those numbers and take a look at something like

10    violence and crime, the violence and crime -- and they discuss

11    this on Page 416 at 2.3.5 -- the violence and crime costs,

12    they say that, starting at the third line, "Sexually abused

13    children are significantly more likely to commit assault,

14    robbery, burglary, and theft.  Costs associated with those

15    crimes were previously estimated by Lochner and Moretti."

16         So, that's an example, it seems to me, of a cost that

17    is not losses to the victim, but economic costs to the overall

18    economic -- to the overall economy.

19         MS. McQUEEN:  And we would agree with that, your

20    Honor.  And just to clarify, if you're looking at Chart 1,

21    which you mentioned, we intentionally excluded all costs like

22    that that are not costs to the victim herself, but that are

23    costs to society.

24         So, in addition to excluding the child healthcare

25    costs -- which is $14,357 worth of that calculation, because

1    her costs were covered by her state's health insurance up to

2    the time she turned 18 -- we also excluded the child welfare

3    costs, the violence and crime costs you just described and the

4    special education costs, as well.

5            The only items from this study that were included in

6    our calculation were the adult medical costs, which were

7    addressed by the government, as well; the productivity losses,

8    which is the loss to her in terms of her inability in the

9    future to earn as much as she otherwise would have been

10   capable, both in terms of not being able to achieve her

11   otherwise -- her potential, to procure a high-earning job and,

12   also, in terms of time that will be lost at that job in order

13   to care for herself because of the harm that's been done by

14   the defendant.

15           And the only other item we included, your Honor, was

16   the suicide death costs, which is a cost that recognizes both

17   the medical expenses that would come along with any medical

18   care she may need should she, God forbid, attempt to harm

19   herself again in the future, as has happened on a number of

20   occasions since she met the defendant and as a direct result

21   of her relationship with him; and, also, further productivity

22   losses as a consequence of costs that would come along with

23   that from failing to go to work.

24           THE COURT:  Isn't it lost productivity costs from --

25   because it deals with suicide death costs.  It appears that

1    the loss of productivity is related to the actual fatal

2    suicide of an adult and that's the number they use to derive

3    the number for suicide deaths.

4          And, so, I guess I'm still kind of confused as to how

5    I'm to disaggregate kind of that number to figure out what

6    portion of that number the authors of this article would

7    attribute as or would believe to be losses to the actual

8    victim.

9          MS. McQUEEN:  I understand that, your Honor.

10   Obviously, unfortunately, we're going off of the same study

11   and the same explanation there.

12         And just the fact that -- we were directed to the

13   study by the expert in this case, Dr. Corwin, who explained to

14   us that it's both the most recent and the most comprehensive

15   study that's ever been done of victims of child sexual abuse

16   specifically, as opposed to just children who have been

17   maltreated.

18         I don't know that there is any more explicit

19   breakdown of that, which is why, hopefully, we tried to make

20   it as clear as possible that we're not just asking for this

21   aggregate $253,850 worth.  We tried to break that down for

22   you, your Honor, so you can see exactly where those numbers

23   are coming from:  The portion that's attributable to her

24   medical costs; the portion that's attributable to productivity

25   losses; and, the portion that would be attributed to those

1    suicide costs.

2          MS. GRODE:  And, your Honor, I would view

3    productivity losses, essentially, as just what we were talking

4    about earlier, with future lost income.  How this study

5    determined the $223,581 number was that they specifically

6    looked at adult earnings and that is what they based this

7    number off of.

8          And they found that adult earnings for women who are

9    victims of child sexual assault were 20.3 percent lower than

10   for women who were not victims.  And, then, they took the

11   median annual earnings for full-time, year-round female

12   workers in 2015, which was 40,000 -- around $40,000 -- and

13   they calculated that experience of child and sexual abuse

14   reduces female victim earnings by $8,271 per year from ages 18

15   to 64.  And, then, after that, they assumed a long-term growth

16   in labor productivity of one percent per year and, then, the

17   present discount value of the earnings.

18         So, I believe that -- sorry to interrupt you.

19         THE COURT:  Do we know what the discount rate is that

20   they applied?

21         MS. GRODE:  I'm actually not sure.  We can submit

22   something after for you.

23         THE COURT:  Well, I ask that because in the prior

24   article -- the Fang, Brown article --

25         MS. GRODE:  Uh-huh.

1      THE COURT:  -- the productivity losses they estimated

2  in their table to be -- of non-fatal child maltreatment -- to

3  be $144,360, somewhere between there and $49,000, depending

4  upon the particular discount rate to apply.

5      So, I was looking trying to figure out what the

6  discount rate was that the authors applied here.  And I

7  suppose if I was smart enough, I could kind of reverse

8  engineer it; but, I lost that ability many, many years ago.

9  But the report doesn't seem to indicate what the discount rate

10 would be.

11     MS. McQUEEN:  We can certainly look into that, your

12 Honor, and see if it's something that we can find.

13     Just for clarity, the reason that we ended up not

14 using the numbers you mentioned in that 2012 study is both

15 just because this study is more recent and more specific to

16 child sexual abuse victims and for the sake of consistency, as

17 well.  We recognize, for example, that the adult medical costs

18 that were estimated in that article are higher than what we've

19 actually requested.  But we wanted to make sure we were being

20 as accurate as possible and using the newest information

21 available.

22     THE COURT:  And, then, going back to Laraneta, where

23 was the pin cite for the quote that you put in the record?

24     MS. GRODE:  Yes.  So, the quote that I read aloud is

25 on Page 988, and the entire case cite is 700 F.3d 983, 988 --

1    Page 988.  And it begins with, "You're looking for the losses

2    for which the two women."

3                THE COURT:  Okay.

4                Anything else?

5                MS. McQUEEN:  That's it, your Honor, unless you have

6    any further questions.

7                THE COURT:  Not at this time.  Thank you.

8                MS. McQUEEN:  Thank you very much.

9                MS. WELSH:  Your Honor, in light of the presentation

10   from the father of Victim F's attorneys, are there any other

11   questions that you have for me specifically as to the

12   application of those future losses as to Victims A through E?

13               THE COURT:  A through E.

14               MS. WELSH:  Or Victim F, I should say, as well.

15               THE COURT:  Should I apply or look to the amendments

16   of SECA, or is there a due process issue at that point?

17               MS. WELSH:  Your Honor, the government's position --

18   and, specifically, I've looked at this in the context of the

19   $35,000 restitution payment.  I do know that that is not

20   retroactive:  A, because there's a due process issue; B, as a

21   practical matter, the fund itself has not been funded yet.

22   And, so, there's no money there for victims.

23               As to the other portions of the statute, it's my

24   understanding that those are not retroactive, as well.  But I

25   can certainly look into that further and submit something to

1    your Honor on that topic.

2           THE COURT:  Furthermore, to the extent that I award

3    anything -- any amount -- for future losses to Victim F, how

4    am I to treat Victims A through E?

5           MS. WELSH:  And that, I think, your Honor, is what

6    the government was trying to address in the last page of our

7    filing.

8           It's the government's position that all of the

9    victims here are similarly situated.  And that's consistent

10   with what the defendant admitted in his plea agreement; it's

11   consistent with the victim impact statements that were

12   presented at the sentencing hearing:  That each of these young

13   girls were victims of the same harms and are going to

14   experience somewhat similar consequences moving forward.

15          And, so, we would ask that in the Court's discretion,

16   to make each of these victims whole, to award restitution with

17   a view to making the victims whole; that if your Honor is

18   inclined to order those future losses as restitution for

19   Victim F, that that would be applicable for Victims A, B, C,

20   D, and E, as well.

21          THE COURT:  And, Ms. Welsh, does the government -- I

22   don't know whether you answered this question before -- and

23   perhaps I didn't ask it in this way, but let me try again.

24          Does the government have a position as to whether or

25   not the restitution statute and Seventh Circuit case law gives

1  me the authority to award as restitution reasonably

2  ascertainable future -- loss of future income?

3           MS. WELSH:  I think it does, your Honor, to the

4  extent that those are reasonably ascertainable, and that the

5  Court is convinced by a preponderance of the evidence that

6  those losses are attributable to the defendant and are

7  necessary to make the victim whole.

8           THE COURT:  Okay.  Thank you.

9           MS. WELSH:  Thank you.

10          THE COURT:  Mr. LeFevour.

11          MR. LeFEVOUR:  Thank you, your Honor.

12          THE COURT:  The floor is yours.

13          MR. LeFEVOUR:  I'm sorry, Judge?

14          THE COURT:  The floor is yours.

15          MR. LeFEVOUR:  Oh, the floor is mine.

16          So, obviously, we've made our position clear in our

17  filing, Judge.  And I was going to comment on the

18  retroactivity, but I don't need to.

19          When you read the case law on this subject, Judge, it

20  puts all the burden on the Court.  And I know that that's why

21  you're the Court, and you have to make those choices.  But the

22  language of almost every case is the same:  Is it the

23  proximate result?  And, then, using a rule of reasonableness.

24  And, then, when you take those two prisms, it's what has been

25  presented to the Court?  Okay?

1        So, with all due respect to Victim F, I don't see --

2   it's just bald conclusions as to the lost income of the

3   father.  We don't have -- I don't have anything to review,

4   especially with the profit sharing.  And we've made that

5   objection clear.

6        As to the general treatises that are there, I have

7   put in my response -- and I know the Court knows this, but

8   these were not -- these were non-contact offenses.  And I'm

9   not minimizing my client's culpability on this.  But those

10  cases, even one of the attorneys up here speaking for Victim F

11  said sexual assault.  That implies a touching or a

12  penetration.  The Court knows that that was not the case here.

13       That doesn't minimize his responsibility for

14  restitution.  But I think it's something when you're talking

15  about discount factors, you have to think what is logical,

16  what is reasonable based on what he did in his, you know,

17  communication with these women electronically.

18       And, then, the fact that there was not distribution.

19  In many of these cases, the pain, the suffering and what's

20  compensated is these women's reputation have been damaged by

21  the fact that their images are now with God knows who.

22       We know from this case that he didn't touch and he

23  didn't distribute.  And, so, I think those are factors that

24  the Court needs to take into account in assessing what is

25  reasonable that's mandated under the MVRA, which is what the

1    government says is the statute that should be applied, which I

2    agree with, and that's how we crafted our response.

3           And we are very respectful of the decision this Court

4    has to make and understand that -- you know, the balancing and

5    the examination that goes into this.  But the Court knows what

6    our position is in this kind of nebulous world.  I mean, it is

7    what is reasonable.  And we know the Court will reach that

8    decision.

9           So, thank you.

10          THE COURT:  Thank you.

11          I would like to hear from the father of Victim F,

12   please.

13          MS. WELSH:  Can he approach the podium, your Honor?

14          THE COURT:  Yes, he can.

15          And before we proceed, I want to go ahead and I'm

16   going to ask Ms. Acevedo to place you under oath.

17          FATHER OF VICTIM F:  Absolutely.

18      (Father of Victim F sworn.)

19          THE COURT:  So, sir, you obviously reviewed the

20   submissions by your attorneys with regard to your lost wages.

21   And the way they calculated was they estimated your hourly

22   wage and the number of hours that you spent accompanying your

23   daughter to various medical appointments and, also, staying

24   with your daughter in the emergency room during the month that

25   you had to.

1          Can you attest, can you confirm that all of those

2    figures are true and accurate?

3          FATHER OF VICTIM F:  Yes.

4          THE COURT:  Okay.

5          With regard to the profit share, can you talk a bit

6    more about the profit share?

7          FATHER OF VICTIM F:  Absolutely, sure.

8          I understand the complexity of that, your Honor.

9    It's really tricky because in my profession, it's not what

10   society recognizes as a normal hourly wage, 40 hours a week

11   scenario.  It would have been simple for me to say a specific,

12   like, say, $48,000 a year and then turned around and say,

13   well, I lost three months worth of work, and we wouldn't be

14   talking about this now.  But that would have been a lie

15   because that's not how I earn my income.

16         It's a luxury-based service industry.  So, when you

17   want to buy a car, you pick a weekend and you go to the car

18   dealership and you buy a car.  When somebody wants to come to

19   me and get a tattoo, if I'm not there, I don't get that

20   income.

21         So, I have a wage that I get based on my salary, and

22   I have a wage that I get being part of the business owner.

23   And, then, when I'm there, I can then become productive; and,

24   those numbers get applied to my income, which gets applied to

25   the end of the year profit of the business, which, in turn,

1    becomes mine.

2            So, that is where that number kind of comes from.  I

3    lost work and could not perform those services.  I wasn't

4    there to do them.  And, on average, I could say the numbers

5    that were used there, there were years in the past where I

6    made more than that.  There was years that I made less.

7    That's pretty much the average over 23 years of my career.

8            THE COURT:  So, there is the -- you mean that's the

9    average -- so, you took the average of the profit share, which

10   is what you would get from the profits of the company that you

11   received over the last 20 years; and, then, you divide that

12   into monthly amounts; and, then, you looked at, well, how much

13   time did I miss, basically?

14           FATHER OF VICTIM F:  Yes.  Yeah.  Yeah.

15           THE COURT:  How many people work at the company, at

16   the store?

17           FATHER OF VICTIM F:  There's myself and my father and

18   three other gentlemen.

19           THE COURT:  Okay.

20           FATHER OF VICTIM F:  And I took -- that number was

21   just my relative number.  Like that wasn't the other.  The

22   profit that I would have gotten from the ownership is the

23   other part of my salary.

24           THE COURT:  I see.

25           So, the profit share that you included that --

```
 1            FATHER OF VICTIM F:  Was just --

 2            THE COURT:  -- that your attorneys used --

 3            FATHER OF VICTIM F:  Was just mine.

 4            THE COURT:  Was just yours?

 5            THE WITNESS:  Yes.

 6            THE COURT:  Your share of the profits?

 7            FATHER OF VICTIM F:  The share that I contributed

 8    that I would have received, yes.

 9            THE COURT:  Got it.  Okay.

10            You can go ahead and -- did you have --

11            FATHER OF VICTIM F:  Yeah, I had a statement here.

12            THE COURT:  Go ahead.

13            FATHER OF VICTIM F:  All right.

14            Your Honor, I've had some time to consider what to

15    say here today.  And while I tried to write this statement,

16    the images and events of my family's life during those times

17    still have an effect on me now, never mind the effects on my

18    daughter.

19            At some point today, I will have heard the

20    perspective of the lawyers in this room; I will have heard

21    many references to other cases or studies, citations from

22    experts; and, possibly some statements trying to belittle,

23    discourage or negate my family's claims or the claims of the

24    other victims.

25            I wanted to speak here today because I feel it's
```

1    important that the victims have a voice.  I don't mean a

2    talented voice or a represented voice that one would hear from

3    the attorneys in this room, but a voice that lived through,

4    and will continue to live through, the inevitable consequences

5    of this case forever.

6          I understand it's the jobs of the lawyers here to

7    represent their clients.  And they wrote many more pages than

8    I've had time to review, and they spoke of or will speak of

9    them today.  But my daughter is a victim.  She's not a letter.

10   I am a victim.  I'm not a page.  And my family is a victim.

11   And we're not a case number.

12         Everyone here will have the ability at some point to

13   close this case, file their papers and move on.  The victims

14   will never forget and will always carry this damaging effects.

15         Restitution was the furthest thing from my mind while

16   caring for my daughter.  Journaling mileage, filing receipts

17   for expenses, tallying the clients I turned away because my

18   daughter had therapy or I needed to take her to the hospital,

19   all of these things meant nothing because I could not see the

20   future.  Nothing told me to track these things.  Everything

21   told me to save my child.

22         On one occasion, after I sought medical help for

23   myself while dealing with the effects of my daughter's

24   condition, I asked the doctors at the institution how families

25   survive this.  Their response was most don't.  They told me of

1   families that lost homes, jobs, income, children, and even

2   other family members.

3           I would like the Court to know that while I sat here

4   during the sentencing, I learned for the first time that the

5   defendant was a victim himself.  I sat here thinking that my

6   heart could break no further.  I realized that not only were

7   the families of the victim devastated, but the defendant's

8   families had at least at one time felt just like us; and, now

9   their loved one had been unable to overcome the effects of his

10  own abuse and had become an abuser himself.

11          I am sure that the family of the defendant wishes he

12  got more support, had more positive influences and, certainly,

13  like my family, wished the abuse didn't happen in the first

14  place.  I would ask the defendant and his family, what would

15  they have given to have never had this happen to you and where

16  do you think you would be if it didn't?

17          The defendant seemingly beat the odds.  He was able

18  to take a step into a career that offered him a life of wealth

19  and fame.  He had hundreds of thousands of followers and

20  established a footing and career many only dream of.  He had

21  the time, the money and the career that should have and could

22  have accessed possibly -- or could have, if accessed, possibly

23  prevented all of this.

24          I can't express the sorrow that I felt that day for

25  all the families that were devastated.

1          Your Honor, you have the unfathomable task of making

2     a decision that will affect our lives.  But be assured it will

3     not cure nor remove the damage done.  I hope you see that this

4     case perfectly represents the scope and the facts about sexual

5     abuse victims represented by many of the expert testimonies

6     and papers available to review around the world.

7          Victims of abuse suffer lifelong consequences.  This

8     case doesn't have six victims.  It has seven.  Each one

9     navigating the effects of abuse.  The most invalid -- the most

10    important and valid supporter of all the statistics

11    represented here today is Victim 7, the defendant.  He is the

12    incarnation of the sexually abused victim statistic.  He

13    validates all the experts.  The nature of this case

14    statistically supports the claims of my attorneys and those of

15    the other victims.

16          I would dare say that when all is said and done, the

17    defendant, a victim of sexual abuse himself, will have had

18    lost wages, legal expenses, medical bills, lifelong financial

19    losses as a result of his abuse that exceeds the greatest

20    number of all our current claims put together, not only

21    supporting our claims for restitution, but reinforcing them.

22          The defendant offered to pay my daughter for acts of

23    pornography.  And after hearing some of the victims engaged in

24    self-harm and thoughts of suicide, the defendant, in his own

25    words, volunteers, tried to plead with the victims to tell

1    them that they had -- they were worth more than that; that

2    they were better than that; and, if there was anything he

3    could do, he would.  They were worth more than that and if

4    there's anything he could do, he would.

5           Now his lawyers want to minimalize what he pays for

6    the actual financial effects occurred by my family, the

7    projected expenses based on his actions.  All that, I'm told,

8    she is entitled to and legally cited by the attorneys.

9           Your Honor, hindsight is 20/20 and foresight is an

10   impossibility.  And the defense would have you discard my

11   claims based on not having the foresight to maintain receipts,

12   documents of losses during these times or having no way of

13   knowing, no experts to tell me of the possible future reasons

14   to prepare or hold onto these items.  But, then, in the same

15   breath, the defense would have you not consider the foresight

16   by the experts in this case.  I hope you see the hypocrisy in

17   that.

18          In closing, your Honor, no amount of money will send

19   me back in time to prevent this; there's no amount of money

20   that I wouldn't have paid to prevent it; and, there's no

21   amount of money that will grant me the foresight to determine

22   which one of all of these victims will beat the statistics and

23   lead a healthy life or which ones will end up just like the

24   defendant.

25          My daughter and all the victims have barely reached

1    adulthood, and some may not have even yet; but, each is

2    entitled to the best possible chance for success, for healthy

3    life, for support if they falter.  And each deserves every

4    possibility and every possible chance to never sit in that

5    chair (indicating) and never tell another judge that they were

6    victim of abuse as a minor by a celebrity and it contributed

7    to them making a poor decision that they'll then have to pay

8    for the rest of their life.

9            The fact is, sir, we don't get to come back and say

10   that wasn't enough.  There's no do-over.  And we shouldn't

11   have to suffer further abuse by hearing the facts of this case

12   in another court.

13           Thank you for listening, your Honor.

14           And thank you to all the attorneys.

15           THE COURT:  Thank you, sir.

16           Let's take a brief recess.

17      (Brief recess.)

18           THE COURT:  Mr. LeFevour --

19           MR. LeFEVOUR:  Yes?

20           THE COURT:  -- I forgot to ask you whether you wanted

21   an opportunity to ask any questions of the father of Victim F.

22           MR. LeFEVOUR:  No.

23           THE COURT:  Okay.

24           Is there anything else that you would like to add

25   today?

1          MR. LeFEVOUR:  Not wanting to ask questions, with all

2     due respect to Victim F's father, I understand the claim for

3     lost wages.  If there are other employees and he's not there,

4     he should still benefit from the profit sharing.  All I'm

5     saying is I would have liked to have seen substantiation.

6          Frankly, I don't understand his methodology, and

7     that's not saying it's not truthful.  I don't understand it.

8     So, I don't get how the profit sharing for loss of 19,000 in

9     income can actually be higher.

10          Other than that, Judge, I have nothing else to say.

11          THE COURT:  Okay.  Thank you.

12          Ms. Welsh, anything else?

13          MS. WELSH:  Your Honor, I would just want to echo one

14     part of what I heard in Victim F's statement, and I would like

15     to represent to the Court that I've heard this from a number

16     of the other parents of victims in this case.

17          In preparing for the restitution hearing, in reaching

18     out to those victims and their parents asking them if they

19     could supply the government with any records or anything like

20     that for past medical treatment, there were a few things that

21     I heard over and over again, and just to share those with the

22     Court to kind of highlight some of the difficulties involved

23     here.

24          Number one, at the time that these victims were

25     experiencing a lot of these psychological harms, their parents

1    had no idea what was happening.  And, so, something that I

2    heard from parents was, well, my teenager started acting very

3    differently, everything started falling apart, and I just

4    didn't know why and I didn't know what to do.

5          And, so, in a lot of cases, either those children did

6    not receive psychological counseling or their parents sent

7    them to, say, an anger management class because they, quite

8    simply, didn't know what to do.

9          And, so, that is just sort of an inherent problem

10   with trying to get the documentation.

11         There's also then the problem that for kids who were

12   receiving treatment, the parents weren't really keeping close

13   records because they just had no idea that they would need

14   those some day.  And I think that anybody who has then tried

15   to go back and tried to piece those things together, it's very

16   difficult.

17         I actually just got some records right before I came

18   into court today from Victim E's mother that, you know, I

19   wasn't able to present today.  And they were for somewhat

20   negligible amounts.  But, you know, she had been trying to get

21   those from healthcare providers, from hospitals, from

22   pharmacies.  And it's just hard.  It's very difficult.  And,

23   so, she wasn't able to get those in time for me to submit to

24   the Court today.

25         And I think that that all kind of goes back to

1   something that is in the case law and something that I put in

2   the government's submission, which is that this doesn't

3   require a precise mathematical inquiry.  It's not a math

4   problem.  It's not something that is amenable to saying,

5   here's the receipt, here's the receipt, here's the receipt,

6   and now we have a number.  It's a difficult calculation.

7           I think the government has endeavored to put together

8   a submission for the Court that is reasonable, that tries to

9   make the victims whole.  And I think that, you know, Victim

10  F's counsel has done that, as well.

11          If there's any other questions that I can answer for

12  the Court, if there are any other pieces that we can try to

13  put forward for your Honor, we would be amenable to doing

14  that.

15          Under the statute, your Honor has to make a finding

16  that there will be restitution entered within 90 days of the

17  sentencing.  But I do believe that your Honor can put in that

18  order that you are still receiving evidence and that the

19  number has not been decided, just to put that out there for

20  your Honor, if there's anything that would be helpful to you

21  in making this decision.

22          THE COURT:  Okay.  Thank you.

23          MS. WELSH:  Thank you, your Honor.

24          THE COURT:  I think there's a lot of benefit to

25  finality in a case like this.

1          MS. WELSH:  Understood, your Honor.

2          THE COURT:  All right.  I want to thank all the

3    attorneys here today.  Your written submissions and your

4    arguments today were very helpful in helping me kind of

5    crystallize the issues.  It is a very vague area, if I could

6    say that.  But the briefs and your comments today kind of

7    helped me through that.  So, I appreciate that.

8          I also want to thank the father of Victim F for being

9    here today and for making his statement.

10         So, before the Court is the appropriate amount of

11   restitution to award to the victims of Mr. Jones' criminal

12   actions.  And, for the record, I wanted to summarize the

13   nature of the crime.

14         Between August, 2016, and May, 2017, Mr. Jones, who

15   was 23 at the time, used his celebrity status to prey upon

16   girl victims who ranged in age from 14 to 15.  Mr. Jones did

17   everything in his power to overcome whatever hesitation and

18   resistance that they put against him by manipulating them,

19   lying to them about non-existent modeling opportunities, and

20   exploiting their admiration of him, their emotional

21   vulnerability, and their insecurity about themselves.

22         And he did this solely so that he can get them to

23   agree to make and send him sexually explicit pictures and

24   videos for his own use and gratification.  Oftentimes he did

25   this pressuring them over their own objections when they

1    needed to do work, spend time with their family or other times

2    just go to bed for the night.  And often he insisted that the

3    victims state in their videos their age, that they were only

4    14 or 15 years old.  He targeted these young, impressionable

5    girls so that he could use their insecurities and admiration

6    against them to get what he wanted.

7         The government has specifically identified six

8    victims, denominated Victims A, B, C, D, E, and F.  At the

9    sentencing hearing, the victims and their parents presented

10   compelling statements as to what impact Mr. Jones' actions had

11   upon them and their families.  It is now time for the Court to

12   determine the appropriate restitution that should be imposed

13   as part of the judgment.

14        As an initial matter, I note that there is no dispute

15   that Mr. Jones is the proximate or sole cause of the losses at

16   issue as to Victims A, B, C, D, E, and F, in that he was the

17   producer; he was the one that got the girls to make the

18   videos; the one that received the videos for his own use.

19        Under 18 U.S.C. Section 2259, I am to award

20   restitution to the victims in the "full amount of the victims'

21   losses."  Those losses include costs for medical services

22   relating to physical, psychiatric or psychological care;

23   physical and occupational therapy or rehabilitation; necessary

24   transportation; temporary housing; and, child care expenses,

25   if any; lost income; attorneys' fees, plus other costs

1    incurred; and, any other losses suffered by the victim as a
2    proximate result of the offense.

3          Furthermore, I am to consider not only the losses
4    that were incurred retroactively but prospective losses.  And
5    that's United States vs. Danser, 270 F.3d 451, Seventh
6    Circuit, 2001.

7          The courts have previously awarded or recognized as
8    losses prospective medical services that could be reasonably
9    attributed to the acts of the defendant.  I believe that
10   prospective losses should also include lost income, to the
11   extent it can be reasonably attributed to the criminal actions
12   of the defendant.

13         The government bears the burden of proof of providing
14   the restitution amount by a preponderance of the evidence.

15         So, first, Victim B requests $732.60 in actual costs
16   for medical and travel expenses.  Victim E requests $360 for
17   medical expenses.  Defendant does not object to these
18   requests, and so the Court will impose those costs.

19         Second, the government requests the Court award or
20   impose for all of the victims $10,530 each for future medical
21   costs, for treatment that's necessary as a result of
22   Mr. Jones' criminal actions.  In support, the government
23   relies on a number of studies, including a study by Fang,
24   Brown, Florence, and Mercy entitled, "The Economic Burden of
25   Child Maltreatment in the United States and Implications for

1    Prevention."  That can be found at Child Abuse and Neglect,

2    Volume 36, 2012, starting at Page 156.

3         Having reviewed the report, the Court finds that the

4    study is persuasive and grants the government's request for

5    restitution in the amount of $10,530 for each victim for

6    future medical expenses.

7         Turning to Victim F's requests.  Courts have

8    recognized that where the victim is a minor, any income loss

9    experienced by the minor's parent or guardian as a result of

10   having to accompany the minor for medical treatment, for

11   example, qualifies as a loss under the statute.  United States

12   vs. Evers, 669 F.3d 645 at 659, Sixth Circuit, 2012.

13        Here the Court finds that there is sufficiently

14   reliable evidence in the record to support Victim F's claim

15   that her father suffered lost income in the amount of $19,794.

16        Furthermore, the Court finds there's sufficient

17   reliable evidence in the record to support Victim F's claim

18   that her family incurred $3,208.57 in travel expenses as a

19   result of defendant 's actions.

20        As for Victim F's request for $26,000 for lost profit

21   share that her father had to forgo as a result of caring for

22   her and accompanying her to her medical treatments, having

23   reviewed the record and considered the statements and

24   testimony before this Court, the Court finds that that claim

25   is too speculative to qualify as a loss under Section 2259.

1    There's simply not enough evidence in the record from which I

2    can find that the government has proved by a preponderance of

3    the evidence that the $26,000 claimed should be counted as a

4    loss under the statute.

5         Turning, finally, to Victim F's request for $294,851

6    for future losses, that amount can be broken down to $282,754

7    for lifetime costs and $41,001 for quality of life loss.  In

8    support, her attorneys cite to a study performed by

9    Letourneau, Brown, Fang, Hassan, and Mercy entitled, "The

10   Economic Burden of Child Sex Abuse in the United States,"

11   Child Abuse and Neglect, Volume 79, 2018, starting at Page

12   413.  In particular, her attorneys reference Table 1 in the

13   study as the basis for this request.

14        As to the quality of life loss, I would note that the

15   authors of the study themselves acknowledge that there was a

16   lack of consensus regarding the usefulness of this figure.  In

17   fact, the article notes that, "Economists do not agree on the

18   value of a QALY in dollar terms or even the validity to

19   attempt such an estimate."

20        Accordingly, given the limitations of that figure,

21   the Court finds that there is insufficient reliable evidence

22   in the record to support Victim F's request for $41,001 in

23   quality of life loss.

24        Turning then to the request for $294,851 for future

25   losses.

1      It must be noted that the overall purpose of the 2018

2    Letourneau study was to estimate the U.S. economic impact of

3    child sexual abuse, not necessarily to estimate the cost to

4    the victims themselves.  For example, as I noted, the figure

5    listed in Table 1 for suicide death costs is the cost to the

6    overall economy related to the individual suicide, including

7    loss of productivity.  Such costs to the general economy are

8    not an accurate or reliable measure of costs or loss to the

9    victim herself.

10      Furthermore, the cost of child and adult medical --

11    of healthcare to be incurred in the future has already been

12    addressed by the $10,530 that I've already imposed for the

13    benefit of each victim.

14      Thus, the only figure that might qualify as a loss

15    other than the medical costs set forth in Table 1 would be the

16    costs labeled "Productivity Losses," which appears to be the

17    present value calculation of future lost earnings for women

18    who have been victims of child sexual abuse.  But this figure

19    is not without its own problems.  For example, the value of

20    $223,581 is based upon the earnings losses from the

21    perspective of victimization at age 11.  Here the victims were

22    a bit older -- 15 and 16.

23      Furthermore, as I noted, the table does not indicate

24    the discount rate that was applied to come up with that

25    figure.  This is significant to me because as the 2010 study

1  by Fang, Brown, Florence, and Mercy indicated, there the

2  productivity losses ranged from $49,000 to $144,000, depending

3  on the discount rate that the study applied.

4       I recognize that the study is not perfect and we

5  can't disaggregate everything in the study.

6       In the end, I find that the studies cited by the

7  government do support the proposition that a victim of child

8  sexual abuse will likely suffer a loss in future earnings.  As

9  to what that amount will be over the course of a person's

10 life, however, is less than clear.  For example, the studies

11 do not differentiate between the types of abuse or the levels

12 of abuse.  The studies also lack other relevant and helpful

13 information such as, as I said, the discount rate or how the

14 underlying studies that these studies cite arrived at the

15 figures upon which the studies rely.

16      However, given the fact that I am duty bound by the

17 statute to impose restitution in this case and to make the

18 victims whole -- and, as Ms. Welsh so aptly noted, as well as

19 defense counsel, it's not a perfect regime, this is not civil

20 litigation where we have the benefit of economists or other

21 experts to come provide testimony before us -- I am limited

22 with the record that I have.

23      Given the fact that it's the government's burden to

24 prove the restitution amount by a preponderance of the

25 evidence, the Court will rely upon the lower amount of $49,068

1    that is set forth in the 2010 study by Fang, Brown, Florence,

2    and Mercy.  And, then, providing the rate of inflation from

3    then to now, that gets us to a lost profit amount -- or lost

4    earnings amount of $60,000.

5          Accordingly, based upon the record before the Court,

6    the Court orders restitution as follows:

7          As to Victim F, $19,794 in lost wages, $3,208.57 in

8    travel expenses, $10,530 in future medical costs, $60,000 in

9    future lost earnings, for a total of $93,532.57.

10         As to Victim B, the Court orders restitution as

11   follows:  $732 in medical and related travel expenses, $10,530

12   in future medical costs, $60,000 in future lost earnings,

13   totaling $71,262.

14         As to Victim E, the Court imposes restitution in the

15   amount of $360 in medical expenses, $10,530 in future medical

16   costs, $60,000 in future lost earnings, for a total of

17   $70,890.

18         And, finally, as to Victims A, C and D, the Court

19   awards restitution in the amount of $10,530 in future medical

20   costs, $60,000 in future lost earnings, for a total of $70,530

21   each, for each victim of the offense.

22         Accordingly, the Court orders total restitution in

23   this case in the amount of $447,274.57.

24         Ms. Welsh, is there anything else that I need to

25   address today?

52

1         MS. WELSH:  I don't believe so, your Honor.

2         THE COURT:  Mr. LeFevour, anything else?

3         MR. LeFEVOUR:  No, your Honor.

4         THE COURT:  Very well.  We're adjourned.

5         MS. WELSH:  Thank you, your Honor.

6                   *    *    *    *    *

7    I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
8

9
     /s/ Joseph Rickhoff                    August 6, 2019
10   Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25